ELLERBE, *Superintendent of Insurance*, v. THE NATIONAL
EXCHANGE BANK OF KANSAS CITY, *Appellant*.

DIVISION ONE.

1.   **National Bank:** DISCOUNTS BY CASHIER: INSURANCE COMPANY.
The cashier of a national bank who was also a director of an acci-
dent insurance company received several notes aggregating $25,000
from subscribers to the stock of the insurance company, placed them
on the books of the bank as discounted paper and passed them at
their face value to the credit of the company.   The makers of the
notes deposited as collateral security the stock of the company there-
upon issued to them.   The company agreed not to draw on that part
of the deposit represented by the notes.   The total deposit of the
company excluding the notes then aggregated $100,000, and the bank
cashier and the president of the company made affidavits to the state
superintendent of insurance that the capital stock of the company,
$125,000, was paid up, and, thereupon, the superintendent authorized
the company to begin business.   *Held*, in a subsequent proceeding by
the state superintendent of insurance, after the dissolution of the

company under the statute, to recover the deposit represented by the notes that, the fact that the interest was not deducted in advance nor the money delivered, but entered as a cash credit, does not support a claim that the notes were neither discounted nor negotiated, and that the act of the cashier was, therefore, one which the bank itself could not do or ratify under Revised Statutes of United States, section 5136, empowering national banks to discount and negotiate notes.

2. ——: ——: ——.  Since the agreement by the insurance company not to draw on the $25,000 was made before it received the certificate from the state superintendent of insurance, when by Revised Statutes, 1879, section 5991, it was expressly prohibited from transacting business of any kind, the agreement on the part of the company not to draw on the funds represented by the notes was not binding on the company, and the bank cannot successfully claim that it ratified the cashier's act, only on the condition of such agreement.

3. ——: ——: ——.  The bank by coercing from the insurance company payment of interest for several months on the $25,000, by threatening to dishonor its checks drawn against that sum, and by subsequently surrendering the notes and the stocks to the makers and receiving from them interest on the notes ratified the act of the cashier in discounting the notes.

4. ——: ——: ——.  A personal agreement by the cashier with the note makers to carry their notes for five years did not affect the relations of the bank, and the insurance company whether known to the officers of the bank or not.

5. ——: ——: ESTOPPEL.  The bank having delivered to the superintendent of insurance a certificate that the capital stock was fully paid up, and the certificate to the company to do business having been issued on the faith of said statement, the bank is estopped to claim in an action by the superintendent that only part of the money was really deposited.

*Appeal from Jackson Circuit Court.*—HON. R. H. FIELD, Judge.

AFFIRMED.

*McDougal & Sebree* and *Elijah Robinson* for appellant.

(1) Warden acted under the authority and with the knowledge of the company, and without the knowledge or authority of the bank. The former should be

bound, the latter not.   He could not and did not bind the bank.   *Ins. Co. v. Hope, etc., Co.*, 8 Mo. App. 408; *McDonald v. Wagner*, 5 Mo. App. 56; *See v. Smith*, 84 Mo. 304; Morawetz on Corporations, sec. 528; *N. Y., etc., Co. v. Ins. Co.*, 14 N. Y. 85; *Wardell v. Railroad*, 103 U. S. 651.   But by adopting his acts the company is bound.   Morawetz on Corporations, sec. 548, *et seq.* (2)   Warden assumed to act for both company and bank—the former knew it, the latter did not.   The bank did nothing by which it could be estopped.   That doctrine does not apply, unless the party to be estopped is affirmatively shown to have influenced the conduct of the other party by something said or done.   *Eitelgeorge v. Ins. Ass'n*, 69 Mo. 52; *Spurlock v. Sproule*, 72 Mo. 503; *Rogers v. Marsh*, 73 Mo. 64; *Acton v. Dooley*, 74 Mo. 63; *Blodgett v. Perry*, 97 Mo. 263.   (3)   The first and second instructions given for plaintiff should have been refused; and the sixth, seventh and eighth asked by defendant should have been given.   *Wilson v. Bank*, 7 Atl. Rep. (Pa.) 145; *De Kay v. Hackensack*, 11 Stew. (N. J. E.) 158; *Brewing Co. v. W. G. & Q. Co.*, 37 Mo. App. 145; *Johnson v. Shortridge*, 93 Mo. 227, 232.   (4)   Ratification is the confirmation of an act which was unauthorized, and possessed no validity without being thus confirmed.   Story on Agency, secs. 250, 251; Bouvier; Webster.   (5)   The bank had no power to grant original authority to Warden to do the acts in question.   All the powers of national banks here involved are, subject to law, to discount and negotiate promissory notes and loan money.   R. S. U. S., sec. 5136.   This express grant excludes all others.   *Bank v. Dearing*, 91 U. S. 29; *Wiley v. Bank*, 47 Vt. 546; *Weckler v. Bank*, 14 Am. L. Reg. (N. S.) (Md.) 609; *Mathews v. Skinker*, 62 Mo. 329, and cases cited. (6)   The notes were not discounted, nor negotiated; nor was money loaned.   It was an attempt to loan

the bank's credit, and this it had no power to do. *Seligman v. Bank*, 3 Hughes, 647, 651. Discounting commercial paper is taking the interest in advance. *Fletcher v. Bank*, 8 Wheat. 350. (7) National banks are restricted, have not the rights of natural persons,. and all acts in excess of the powers expressly granted are void. *Bank v. Johnson*, 104 U. S. 271; *Bank v. Sevier*, 14 Fed. Rep. 662. (8) For the reason that the bank had no power to grant authority originally, it had no power to ratify the unauthorized acts in question. *Com. v. Railroad*, 50 Ind. 112; *Boynton v. Lynn*, 124 Mass. 197; Morse on Banks & Banking [3 Ed.] sec. 101, p. 212; *Express Co. v. Trego*, 35 Md. 417; *Kelly v. Railroad*, 141 Mass. 496; 1 American & English Encyclopedia of Law, 434, and cases cited, note 1; *Ashbury, etc., Co. v. Riche*, 7 H. of L. (L. R.) 653, 672. (9) Had the bank attempted to ratify Warden's acts, it must have adopted them as a whole.. 1 American & English Encyclopedia of Law, 434, and cases cited, note 5. And this it could not do, for the additional reasons that such acts were unlawful as well as against public policy. *Shisler v. Vandike*, 92 Pa. St. 447; *Wiley v. Bank*, 47 Vt. 546; Green's Brice's Ultra Vires, 550, notes. In so loaning the bank's credit, appropriating its assets, making false entries, and entering into the contracts named, the then officers of the bank violated the law. Their acts were against sound morality, injurious to the public, in violation of the restrictions placed on the bank, and if sanctioned would encourage them to evade the laws, and for these reasons such acts were void, because against public policy, and could not be ratified. *Stanton v. Allen*, 5 Denio, 434; Greenhood on Public Policy, 3, and cases cited, note 1; 541, 2; *Shenk v. Philips*, 6 Brad. (Ill.) 612, 619. (10) If the acts complained of could have been ratified, then they were not, for the reason that.

before one can avail himself of this doctrine he must allege and prove that the other, with full knowledge of all material facts, adopted the act of his agent. *Norton v. Ball*, 43 Mo. 113; *Clark v. Lynn*, 7 Nev. 75; *Pacific, etc., Co. v. Railroad*, 7 Saw. 61; *Whitford v. Monroe*, 17 Md. 135; *Moore v. Patterson*, 28 Pa. St. 505. There can be no assent without knowledge. *Bank v. Drake*, 29 Kan. 231; *Baldwin v. Burrows*, 49 N. Y. 211; *Windsor v. Bank*, 18 Mo. App. 675. (11) The bank did not become liable to the company by accepting from the note makers the balance due. Green's Brice's Ultra Vires, 714, 717, 721.

*Huff & Hereford* and *Pratt, Ferry & Hagerman* for respondent.

(1) If, upon the pleadings and undisputed facts, the judgment is for the right party, it is the duty of this court to affirm, even though the court below placed the recovery upon a different ground, and even though there were errors intervening on the trial. This, of course, is the result of the provisions of the statute, sections 2100, 2303, 2304. The proposition as put has been expressly stated frequently. *Fitzgerald v. Barker*, 96 Mo. 661; *Kelley v. Railroad*, 88 Mo. 534; *Orth v. Dorschlein*, 32 Mo. 366, 368; *Garesche v. Deane*, 40 Mo. 168. (2) Defendant is in no position to complain of the submission of this case, because the case was sent to the jury on the very theory upon which they tried the case. (3) This case can be affirmed either by the doctrine of estoppel or the application of the rule that, whenever one of two innocent persons must suffer through the wrong of a third, the loss must fall upon him who has put it in the power of the third person to do the wrong. (4) The case can be affirmed

upon the doctrine of election sometimes called "*quasi estoppel.*" There are numerous cases in this state holding that if an agent does an unauthorized act, and the principal accepts any benefit therefrom, he is bound thereby. The effect in law is that the whole transaction is adopted, even though the party protests that he is not adopting it. *Norton v. Bull*, 43 Mo. 113; *Carson v. Cummings*, 69 Mo. 325; *Neff v. Redmon*, 76 Mo. 195; *Davis v. Krum*, 12 Mo. App. 279. (5) The transactions should be upheld on the ground of ratification. Assuming that Warden's individual contracts were concealed, we have already seen that the relation of principal and agent existed between the bank and Warden; no rule is better settled in this state than that the acceptance of any benefit from the unauthorized act of the agent binds the principal. *Ruggles v. Washington Co.*, 3 Mo. 496; *Norton v. Bull*, 43 Mo. 113; *Carson v. Cummings*, 69 Mo. 325, 331; *Neff v. Redmon*, 76 Mo. 195; *State ex rel. v. Harrington*, 100 Mo. 170; *Davis v. Krum*, 12 Mo. App. 279; *Hammerslough v. Cheatham*, 84 Mo. 13, 19. We may state the rule in still stronger terms. It is not material that the agent committed frauds or made misrepresentations. The principal cannot be permitted to enjoy the fruits of the bargain without adopting all the instrumentalities employed by the agent in bringing the transaction to a consummation, and "the fruits of the bargain" are enjoyed as long as the benefits of the deal are retained. *Menkens v. Watson*, 27 Mo. 163; *State ex rel. v. Harrington*, 100 Mo. 170; *Elwell v. Chamberlain*, 31 N. Y. 611; *Busch v. Wilcox*, 82 Mich. 315; *Morse v. Ryan*, 26 Wis. 356; *Mundorf v. Wickersham*, 63 Pa. St. 87; *Shoninger v. Peabody*, 57 Conn. 42, and cases cited; *Seago v. Martin*, 6 Heisk. 308. We realize and recognize the rule that a ratification to be binding must be made with full knowledge of all the material facts,

but we submit that where the principal accepts, retains and refuses to give up the benefits of the transaction, then, in such case, the law presumes that it was either done with full knowledge, or else that the principal made all the investigation he desired. *Norton v. Bull*, 43 Mo. 113; *Busch v. Wilcox*, 82 Mich. 315; *Meehan v. Foreste*, 52 N. Y. 277; 1 Wait's Actions & Defenses, 234.

BRACE, J.—The Midland Accident Insurance Company of Kansas City was incorporated under the insurance laws of Missouri on the twenty-sixth of January, 1889, with a capital stock of $125,000. At that time the defendant duly incorporated under the laws of the United States was doing a general banking business in the City of Kansas, Thomas T. Crittenden being its president and James S. Warden its cashier, and both members of its board of directors. They were also stockholders and officers in the insurance company, Crittenden being a director and president, and Warden a director thereof.

Among the subscriptions to the capital stock of the insurance company were the following: Charles D. Lucas, $5,000; L. F. McCoy, $5,000; Daniel Bullard, $5,000; Thomas H. Edwards, $2,500; George E. Ford, $7,500.

In order to raise the money to pay for their stock, each of these subscribers executed a negotiable promissory note for the amount by him subscribed, dated January 26, 1889, payable to himself six months after date at the Exchange National Bank of Kansas City, Missouri, with interest after date at ten per cent. annually until paid, and having indorsed the same these notes were afterwards taken to the bank, passed through the books of the bank as discounted paper by the officers thereof, and the amount of the face of the notes,

aggregating $25,000, placed to the credit of the insurance company, as cash, on the books of the bank, of which credit the secretary of the insurance company was advised; paid up capital stock of the insurance company was thereupon issued to these parties in accordance with their subscription, and the same was then deposited in the bank and attached to these notes as collateral security for their payment. The cash to the credit of the company, as shown by the books of the bank including this $25,000, on the sixteenth of February, 1889, was $125,671.78.

Thereupon the cashier of the bank and the president and secretary of the insurance company issued the following affidavits;

"STATE OF MISSOURI,  ⎫
"Jackson County,   ⎬  ss.
"Kansas City.    ⎭

"James S. Warden, being duly sworn, deposes and says that he is the cashier of the National Exchange Bank at Kansas City, Missouri; and he further says that the Midland Accident Insurance Company of Kansas City, Missouri, has on deposit to its credit in the said bank the sum of one hundred and twenty-five thousand dollars ($125,000) in actual cash, and that the said sum has been paid into said bank and deposited therein by the stockholders of the said insurance company, as the capital stock of the Midland Accident Insurance Company aforesaid.

"JAMES S. WARDEN.

"Subscribed and sworn to before me this sixteenth day of February, 1889.

"[Seal]      HENRY HOUSTON CRITTENDEN,
"Notary Public."

" STATE OF MISSOURI, ⎫
" Jackson County,     ⎬  ss.
" Kansas City.        ⎭

"Thomas T. Crittenden, president, and C. D. McCoy, secretary, being duly sworn, depose and say that they are, respectively, the above-described officers of the Midland Accident Insurance Company of Kansas City, Missouri, and that the money amounting to the sum of one hundred and twenty-five thousand dollars ($125,000) exhibited this day to Alfred Carr, superintendent of the insurance department of the state of Missouri, is the *bona fide* property of the said company, free and clear of any liens or claims thereon whatsoever.                THOS. T. CRITTENDEN."

"C. D. McCOY,                        President.
    "Secretary.

"Subscribed and sworn to before me this sixteenth day of February, 1880.

"[Seal]        HENRY HOUSTON CRITTENDEN,
                            "Notary Public."

Upon this exhibition of the condition of the capital stock of the insurance company, the superintendent of insurance issued his certificate authorizing the company to commence business under its charter. His certificate was received by the company about the first of March, and soon thereafter they commenced business.

It appears from the evidence that, although the bank had a discount committee consisting of the president, cashier and one of the directors, the matter of discounting paper and loaning money for the bank was left practically within the control of the cashier, Warden; and that he was also the largest stockholder in the insurance company and took an active part in promoting its organization. As an inducement to the four subscribers, Lucas, McCoy, Bullard and Edwards, to take stock in the company and execute their notes

as aforesaid, he entered into a like written agreement with each, one of which is as follows:

"Whereas, the undersigned has this day made, executed and delivered to Jas. S. Warden his several obligations for the payment of money, which money had been invested in the Midland Accident Insurance Company, of Kansas City, Missouri, upon the understanding and agreement that said Midland Accident Insurance Company shall make certain investments, well understood by and between the undersigned and James S. Warden, and upon the express agreement that the amount of the obligations hereinabove mentioned are to be paid out of the earnings of the Midland Accident Insurance Company as dividend and surplus.

"*Now, therefore*, It is agreed between the undersigned and James S. Warden, that said above and foregoing mentioned obligations shall be carried upon semi-annual renewals until the same shall be paid off and from the earnings upon said Midland Accident Insurance Company's stock.

"It is expressly understood and agreed that at the end of each six months a sum of money shall be indorsed upon the above and foregoing mentioned obligation equal to the dividend declared upon said Midland Accident Insurance Company's stock, and the surplus carried to the surplus account of said Midland Accident Insurance Company's business, to be applied, first, in the payment of the interest on said above and foregoing mentioned obligations, and thereafter upon the principal.

"And it is further expressly understood and agreed that, in case of the failure of the said Midland Accident Insurance Company to make or earn a dividend, that the said above and foregoing mentioned obligations shall be reduced by at least twenty per cent. net per annum, and shall be paid within the period of five years.

"But it is expressly understood and agreed that, if at any time during the period of the above and foregoing mentioned notes or the renewal thereof, the said Midland Accident Insurance Company's stock becomes worth a premium in excess of the true value thereof, as appears upon the company's books, then the said James S. Warden may demand payment to the amount of such value, in excess of its actual value upon the books, at no time requiring a double payment on said account. And nothing herein shall be construed to mean that the said obligor, making the above and foregoing mentioned obligations, shall be relieved from the final payment thereof on the termination of the period of five years.

"Witness our hands, this twenty-sixth day of January, 1889.          Chas. D. Lucas.

"James S. Warden."

On the sixth of March there was to the credit of the insurance company on the books of the bank, including the $25,000 aforesaid, $93,747.21, to which fact Mr. Lowe, a director and vice-president of the bank, made affidavit, for the purpose of enabling the company to do business in the state of Kansas.

On the twelfth of March, Crittenden ceased to be president of the bank, and was succeeded by Mr. Lowe, who continued in office until about the twenty-second of May, when he was succeeded by Mr. Cravens. At some time during the presidency of Mr. Lowe, and probably a short time prior to the eighth of May, he and Mr. Cravens and some others of the directors of the bank became personally cognizant of the condition of these notes and the cash credit of $25,000, and of the affairs of the bank generally; and were informed by Warden that the bank was perfectly safe; that he had an understanding or agreement with the insurance

company that this cash credit of $25,000 was not to be checked out, or that their account was not to be checked below that account.

On the eighth of May, Warden resigned his position as cashier, as a result, no doubt, of the investigation of his management of the affairs of the bank, just before and about that time being made by its other officers, and substituted his own note in place of Ford's, who was insolvent. This substitution appearing on the books of the bank. His resignation was not formally presented and entered on the record, however, until the twenty-second of May, and he continued a director until some time in July.

On the sixth of June, 1889, Mr. Cravens, who in the meantime had become president of the bank, mailed the following lettter to the insurance company:

"June 6, 1889.

"*Midland Accident Insurance Company, Kansas City, Missouri.*

"GENTLEMEN:—As we are advised as to the arrangement made between you and the officers of this bank at the time your stock notes were discounted here, you were at all times to keep with this bank a credit balance in excess of the amount of the stock notes held by us. The amount of these notes now held by us is $26,800. Your balance at close of business this evening is $26,496.54, or $236.99 less than I reported to your president to-day. The deficit of deposit less than stock notes is to-night $303.46. Under these circumstances we will not feel authorized to pay any more of your checks.     Very respectfully,

"JOHN K. CRAVENS,

"President."

Mr. Cravens says he does not remember to have received any response to this letter, and continuing in this connection he testifies that: "About the middle

of July I discovered that the company had continued to draw checks, and that the acting cashier of the bank had inadvertently permitted the checks to be paid, so as to reduce the amount to the credit of the insurance company below the amount agreed on, and I wrote the insurance company another letter, again calling attention to what Mr. Warden said was the agreement, I having then had another talk with Warden, in which he reiterated his former statement as to the agreement. This letter was written and mailed to the company July 16, 1889. Warden had some time before that ceased to be cashier of the bank, but was still a director in the insurance company, and in reality its principal managing officer, as I understand it. In response to this letter, Mr. Warden came to see me in regard to the matter, and said that just at that time the insurance company was in urgent need of money, because of having made some loans, and, if the bank would advance to the company $3,500, he would secure the same by a mortgage on a farm he owned in Sumner county, Kansas, and that out of this $3,500 the company would pay the interest on these notes, and would not request any more money. I assented to this proposition, and advanced the $3,500; that is, permitted them to check out that amount, and Mr. Warden kept promising, from time to time, to secure it as he had agreed to do, but never did so. The insurance company checked out this $3,500, or what remained of it, and did not stop there but continued to draw checks on the bank in violation of what I understood was the agreement, and the bank declined to pay them. I don't remember just when this was, but probably some time latter part of July and first of August.

"After the bank refused to pay these checks, I heard for the first time that the insurance company claimed a right to any portion of the $25,000. I think Gov.

Crittenden, Mr. C. D. Lucas and C. D. McCoy, who·
were all officers in the insurance company, then claimed
that Mr. Warden had discounted the notes for the·
makers thereof, and that the insurance company was·
entitled to the money; and they denied that the insur--
ance company had made.any agreement not to draw the·
money. They said the insurance company had had
nothing to do with the notes, and would not have any-
thing to do with them. They said these notes were not,
and never had been, the property of the insurance com--
pany, but had been discounted by Warden for the·
makers thereof; and that Warden had placed the amount·
to the credit of the insurance company, without any·
condition or agreement, such as Warden had informed
me existed. The makers of these notes all then claimed
that they had given the notes to Warden upon his
promise to have them discounted for them; and, upon
obtaining this information, I called a meeting of the·
board of directors of the bank to consider the matter,
and the board determined to cancel the credit which
appeared in favor of the insurance company on the·
books of the bank, and to surrender the notes to the·
makers thereof, and if possible to get them each to pay
*pro rata* share of the $3,500. Afterwards I surrendered
each of them his note, and they each paid a propor-
tionate part of the $3,500.''

The letter of the sixteenth of July referred to by·
Mr. Cravens is as follows:

"July 16, 1889.
"*Midland Accident Insurance Company, Kansas City,.
Missouri.*

"DEAR SIRS:—In a conference with Mr. Warden
in regard to the stock notes held here, he again assured
me that the balance should-not be drawn below $25,000.
At close of business this day I find your balance to be·

only $24,827.12, and shall be constrained to withhold payment of your checks until the balance exceeds $25,000.    Very respectfully,

"JOHN K. CRAVENS,

"President."

On the twenty-sixth of July the notes matured, the interest on them to that date was paid by charging the amount to the account of the insurance company, and on the back of each note the indorsement made— "Interest paid to January 26, 1889."

On the fourth of October, by order of the board of directors of the bank eighty-six per cent. of the principal of each note was credited thereon, and that amount charged to the account of the insurance company. Of which action the insurance company was advised by the following letter:

"KANSAS CITY, Mo., October 8, 1889.

"*Midland Accident Insurance Company, Kansas City, Missouri.*

"DEAR SIRS:—Pursuant to direction of the board of directors of this bank, we have credited, *pro rata*, the notes of the stockholders of your company deposited with this bank, with the sum of $21,500, balance of the credit created by the deposit of said notes and apparently to your credit on the books of this bank as follows: Charles D. Lucas, note for $5,000, credit eighty-six per cent., $4,300; L. F. McCoy, note for $5,000, credit eighty-six per cent., $4,300; Daniel Bullard, note for $5,000, credit eighty-six per cent., $4,300; Thos. H. Edwards, note for $2,500, credit eighty-six per cent., $2,150; James S. Warden, note for $7,500, credit eighty-six per cent., $6,450. The whole sum, $21,500, so credited in the notes we have

charged to your account. Balance due this bank, $3,500, and interest since July 26, 1889.

> "Very respectfully,
> "JOHN K. CRAVENS,
> "President."

And the makers of the notes, by letters, of which the following is a copy of one:

> "KANSAS CITY, Mo., October 9, 1889.
> "*Charles D. Lucas, Esq., Kansas City, Mo.*
>
> "DEAR SIR:—Pursuant to direction of the board of directors of this bank, we have credited your note, dated January 26, 1889, for $5,000, deposited with this bank for the credit of the Midland Accident Insurance Company, with the sum of $4,300, its *pro rata* share of the sum of $21,500 apparently remaining to the credit of that company on the books of this bank. There remains due this bank on your note $700, together with interest since July 26, 1889, on $5,000. You will please to make payment of this balance without delay, otherwise we shall feel constrained to expose to sale the stock of your company, pledged as collateral to secure payment.    Very respectfully,
> "JOHN K. CRAVENS,
> "President."

The cash credit, to the amount of $21,500, of the insurance company on the books of the bank having thus been disposed of, according to the bank's "own sweet will" the account of the company, on the fourteenth of October, was balanced, leaving to its credit just *thirty-nine cents.* The makers of the notes responded to the bank's notice by paying (each of them) the remaining fourteen per cent. of the principal of the notes, amounting to $3,500, and interest on the whole amount, $25,000, from July 26 to, say, October 15; and thereupon their notes and the $25,000 paid-up

capital stock in the insurance company was delivered to them by the bank.   And no doubt, to the bank and to the makers of these notes, this was evidently a very satisfactory arrangement, as thereby the bank collected $25,000 of its bills payable, on which it received altogether ten-per-cent. interest from January 26 to October 15.   And the makers of the notes got $25,000 of the paid-up capital stock of the insurance company, for which they had agreed to pay par for fourteen per cent. of its face value, and interest on it from July 26 to October 15.

Not so with the insurance company, however, $25,000 of its capital stock, paid up, was out against it, for which it had received only $3,500, less interest on $25,000 from January 26 to July 26.   And it responded with the following letter and protest:

"October 31, 1889.

"*John K. Cravens, Esq., President National Exchange Bank, City.*

"DEAR SIR:—At a meeting of the board of directors of the Midland Accident Insurance Company held at its office on the thirty-first day of October, 1889, your letter of October 8 in reference to our deposit in the National Exchange Bank of this city was presented, when the following action was taken:

" 'Whereas, the Midland Accident Insurance Company had on deposit with the National Exchange Bank, of Kansas City, Missouri, the sum of $21,500.39; and

" 'Whereas, the sum of $21,500, by an order of the directors of said bank has been applied to the payment of individual paper, held by said bank, without the authority or consent of the directors of this company; now therefore be it

" 'Resolved, That this board hereby enters its formal protest against the action of the officers of said bank, and hereby refuses to acquiesce in or conform to

same, and that said bank is hereby notified that the said Midland Accident Insurance Company demands that said deposit be restored subject to draft.'

"By direction of the board I transmit a copy of these resolutions to your bank.    Very respectfully,

"C. D. McCoy,

"Secretary."

This was the condition of affairs between the company and the bank, when on February, 1890, by a proper proceeding had in the circuit court of Jackson county, under sections 5936 and 5938 to 5942 inclusive (R. S. 1889), the insurance company was enjoined from doing further business, duly dissolved, and its assets vested in plaintiff as superintendent of insurance for the benefit of "the creditors and policy-holders of such company and such other persons as may be interested in such assets," as provided in section 5944, *supra*.

At the April term following of said court, this suit was instituted by the plaintiff to recover said sum of $21,500.    And at the following October term of said court the case was tried before a jury, the issues found for the plaintiff and a judgment for that amount with six-per-cent. interest from October 3, 1889, rendered in his favor, from which the defendant appeals.

The case was submitted to the jury on the following instructions:

Plaintiff's instructions:    "1.    The court instructs the jury that if they believe from the evidence that the National Exchange Bank, defendant herein, did on or about February—, 1889, receive for discount the notes of Charles D. Lucas, L. F. McCoy, Daniel Bullard, Thomas H. Edwards and George E. Ford, aggregating $25,000, and that said notes were discounted by said defendant and the proceeds thereof placed to the credit of the Midland Accident Insurance Company as the money of said company, in payment of stock in said

company, subscribed for by said individuals, and on the faith of such credit the insurance company did issue such stock as paid for, and that afterwards defendant did, upon demand made, refuse to pay to said insurance company $21,500 of said sum, then they will find for plaintiff if they further find the facts to be as submitted in the next instructions.

"2.   If you find the facts as stated in instruction, numbered 1, and that, on the faith of such credit (if any), the insurance company issued the stock to said persons so executing notes, and that afterwards the defendant discovered all that had been done in its name or on its behalf (if anything), then, if it desired to claim that the transaction was unauthorized, it was its duty to be reasonably prompt in giving notice to the insurance company repudiating the transaction, and to accept no advantage therefrom, and if, after such discovery, defendant accepted any advantage from such transactions, then it is bound by the transactions the same as if authority had been originally given.   And, in such case there would be no right to charge back said $21,500 on the account of the insurance company without the latter's consent."

The court, of its own motion, over the objection of defendant's counsel, gave the following instruction: "The court instructs the jury that the cashier Warden had no authority for the bank to discount the notes of the individuals mentioned in instruction, numbered 1, read to you by counsel for plaintiff, nor to place the proceeds of such notes to the credit of the insurance company, and unless you find the additional facts submitted in instruction, numbered 2, read to you by counsel for plaintiff, then your verdict must be for defendant. "

Defendant's instructions: "1.   The court instructs the jury that the plaintiff in this action has no other or

greater rights than the insurance company itself had at the time its assets were taken charge of by the plaintiff; that is, that the decree of the court mentioned in plaintiff's petition invested him with the same rights and no other in regard to the matters in controversy in this case, that the insurance company had at that time.

"2. The court instructs the jury that so far as their verdict in this case is concerned it is entirely immaterial whether there are any policy-holders in the insurance company or who are its creditors, or whether it has any creditors, none of these questions being involved in the issue in this case. Nor is it material what the possible interest of the respective stockholders in said insurance company may now be or become, and can only be considered in determining the credit that ought to be allowed to the testimony of such witness if the jury deem it affected thereby.

"3. The court instructs the jury that the testimony in this case shows that in attempting to discount the notes in question at the National Exchange Bank James S. Warden was acting either for the makers of the notes, for the insurance company or for himself, as well as for the bank, and, therefore, could not bind the bank in that transaction, and before the plaintiff can recover in this case it must be shown to the reasonable satisfaction of the jury, by the testimony in the case, that the acts of said Warden in undertaking to discount said notes at said bank and place the amount thereof to the credit of the insurance company were afterwards sanctioned and acquiesced in by other officers of the bank, with full knowledge of the facts and circumstances attending the said acts of said Warden (unless the jury find for the plaintiff upon the facts submitted in instruction, numbered 2, read to you by counsel for plaintiff).

"4. The court instructs the jury that James S.

Warden, being a stockholder and director in the insurance company, as well as cashier of the bank, had no lawful power or authority to bind the bank by any statement he might make in favor of the insurance company, and the plaintiff is not entitled to recover in this action on account of any representations made by said Warden to any other officer of the insurance company in regard to any deposit having been made in said bank to the credit of said company, even though the jury may be satisfied, from the testimony in the case, that he made such representations.

"The court instructs the jury that a cashier of a bank cannot, without special authority from the board of directors, bind the bank in any transaction in which he is himself individually interested, or in which he undertakes to act for any other person or corporation; and, if the jury believe from the testimony in this case, that said Warden, while acting as cashier of the defendant (the National Exchange Bank) undertook, without the consent of the board of directors of said bank, to discount the notes in question in this case and to place the amount of said notes to the credit of said insurance company, but also at the same time and in the same transaction undertook to act for himself, or for the party or parties for whom he was discounting said notes (whether the makers of said notes or the insurance company), then the said acts of said Warden in so undertaking to discount said notes and place the amount thereof to the credit of the said insurance company were illegal, and did not bind said bank.

"And the court further instructs the jury that no director of said bank, who was also a stockholder and director of said insurance company, was competent to authorize, consent to or sanction a transaction on the part of said bank with said insurance company.

Vol. 109—30

"And the court further instructs the jury that the said bank could not be in any way estopped, or bound by any statement of said James S. Warden, its cashier, made to said insurance company while he was a stockholder in and director of said insurance company and acting in said capacity; and, therefore, although said Warden may have stated to the officers of said insurance company that the amount of the aforesaid notes had been placed in said bank to the credit of said insurance company, and, although the stock of said company may have been issued on the faith of such statements of said Warden, still said bank is not made liable thereby for the money sued for in this action, or any part thereof, if the jury further believe from the testimony in this case that the said Warden was, at the time of making such statement or representation, a stockholder in and director of said insurance company, and taking an active part in the organization and business of said company."

I. The theory, in brief, upon which the case was submitted to the jury, as embodied in the foregoing instructions, when applied to the facts in evidence, is: That Warden, the cashier of the bank, being at the same time a stockholder and director in the insurance company, and acting as cashier for the bank, and acting also at the same time either for the makers of the notes, the insurance company, or himself, in receiving these notes and carrying them through the books of the bank as discounted paper, and placing the $25,000 as the proceeds thereof to the credit of the company as cash, did not bind the bank by such credit, and the plaintiff cannot recover unless, after such transaction was discovered by the other officers of the bank, it was sanctioned by them, or they accepted and retained for the bank some advantage obtained by means thereof.

Recovery, therefore, in the trial court was had upon the ground of ratification by the bank of the unauthorized acts of its cashier after such acts came to its knowledge. While the ostensible grounds for reversal are based upon exceptions to the action of the court in giving and refusing instructions, the argument of counsel on each side is devoted to the discussion of legal principles decisive of the case applicable to the salient facts, established by the pleadings and evidence, without much regard to the instructions, with the view, no doubt, of having a final decision upon the merits of the case, though technical errors may have been committed, or the case submitted upon an incorrect theory. Without further reference to the instructions, then, except incidentally as may be necessary in the course of the opinion, the case will be so discussed and treated as, under the law, may well be done. R. S. 1889, secs. 2100, 2303, 2304; *Fitzgerald v. Barker,* 96 Mo. 661; *Orth v. Dorschlein,* 32 Mo. 366.

II.   It is contended that the bank had no power to do the acts done by its cashier in this transaction in its behalf; and having no such power it could not authorize its cashier to perform such acts; nor, if performed by him without express authority, could it ratify them.   The deductions in this proposition must follow, of course, if the premise is correct; and, in support thereof, we are cited to the seventh clause of section 5136 of Revised Statutes of the United States, which provides that national banks shall have "all such incidental powers as shall be necessary to carry on the business of banking, by discounting and negotiating promissory notes, drafts, bills of exchange and other evidences of debt; by receiving deposits; by buying and selling exchange, coin and bullion," etc. It would be a very narrow construction, indeed, to hold that the notes were neither discounted nor negotiated

because the interest was not taken in advance, or that money was not loaned on them, because the money was not actually passed over the counter, but, instead, entered as a cash credit. That proposition cannot be maintained, and the authorities cited do not support it.

III. It is next contended that, if the bank ratified the transaction at all, it must be held to have ratified it as made, and accompanying the negotiation of the notes, there was an agreement on the part of the insurance company that the amount passed to the credit of the company was not to be checked out; and, if the bank ratified it, it did so with that agreement as a part of the transaction which practically wiped out the credit as cash. The answer to this proposition is, that there is no legal evidence that any such agreement was made by the company, and, in the nature of things, there could have been no such agreement, because, at the time, the company had no power to make it. The loan was negotiated on the fifteenth and sixteenth of February, 1889; at that time a certificate of incorporation had been issued and received by the company, as provided by section 5991, Revised Statutes, 1879, and it was then authorized to organize and open and keep open books for subscriptions to the capital stock; but, besides this, it was expressly prohibited from issuing policies or transacting "business of any kind or nature whatever," until the superintendent of insurance should issue his certificate, as provided for in sections 5992 and 5993, which was not done until about the first of March, when, for the first time, the company was authorized to commence business, and incur obligations of any kind. The suggestion that there was such an agreement is simply to suggest the mode by which certain individuals intended to carry out the stupendous fraud which the evidence discloses was perpetrated upon the insurance department of the state, and by

means of which, life and the power to create obligations was given to this insurance company. The company itself was, in part, the child of such a fraudulent and unholy coition, no doubt, but the sins of its procreators ought not, and cannot, be visited on its head.

IV.   The agreement entered into between Warden and the other four note-makers, by which he undertook to have their notes carried for five years, was a personal agreement of his with them, in no way affecting the relations between the bank and the insurance company, and cut no figure in the case, whether the other officers of the bank knew of it or not, or when they obtained such knowledge, if they had it at any time.

V.   We see no ground for the defendant to escape liability, even upon the loop-hole left it by the theory upon which the case was tried below; for after it became fully advised of what Warden, as its cashier, had done in its behalf in the matter of this loan, instead of repudiating his acts and restoring the fruits of them, so far as it was possible for it to do so, it affirmed those acts by deliberately proceeding to reap the harvest which he had sown, *first*, by coercing from the company payment of the interest of the loan from the date of the notes until the twenty-sixth of July, by threatening to dishonor its checks; after which it seemed willing to rest for a while, and to continue, indefinitely, the fraud involved in the suggestion that there was an agreement on which it relied, that the cash balance on its books to the credit of the company was to be treated as a sham, and remain simply as a decoy, not to be drawn upon. But the company continued to draw as its exigencies required, and on the fourth of October the defendant determined (and shortly afterwards proceeded) to gather in all the remaining fruits of the corrupt practice of its cashier,

by taking $21,500 of the cash balance to the credit of the company, and with $3,500 and ten-per-cent. interest on $25,000 from July 26 to October 15, collected from the makers of the notes, paid these notes off in full to itself; and not only surrendered the notes to the makers, but actually presented them with eighty-six per cent. of the capital stock of the company, for which they paid nothing and the company received nothing. Thus consummating this branch of the great fraud perpetrated upon the insurance department of the state in the organization of this insurance company, while the company itself was in the very throes of parturition, without power either to bind or protect itself, and when those who were to become its policy-holders and its creditors had no one to protect their interest but the state, through its superintendent. This brings us to the real kernel of the case, which, as usual, is to be found in a nutshell.

VI. As we have said, the bank had power to make the loan in question in the manner in which it was made. The making of it to the parties whose notes were taken there for that purpose was within the scope of the apparent authority with which the bank had clothed its cashier. If, by reason of the relation he sustained to these parties (or either of them), he could not have a valid transaction with them, that would be binding upon the bank—that is a question between them and the bank—and does not affect this case. Neither the plaintiff nor the insurance company were parties to that transaction, nor had (or could have had) anything to do with it when it transpired. The powers of each of them were strictly defined by law, of which the defendant and every citizen must take notice. The only power the insurance company had was to open its books and receive subscriptions for its capital stock; beyond this, it could

enter into no obligation itself, nor could any officer for it, whatever his position may have been in it, or whatever relation he may have sustained to it; no one could have been acting for it in this transaction with the bank.  On the other hand, the bank had power to receive deposits and issue bank pass-books, or other evidences of such deposits; and there can be no question that the cashier and his assistant, by whom the entries were made, and the bank pass-book in this case issued, were authorized to receive deposits, credit them to the account of the party for whom the deposit was made, and certify to such deposit, either by bank pass-book or otherwise.  The first time the insurance company comes, or could come, into contact with this transaction is when it is presented with the evidence of the deposit of $25,000 cash to its credit in the bank, furnished by the officers of the bank, acting within the purview of their authority and in the line of their employment.

So far as the insurance company is concerned, if it acted upon that evidence, the case would not be different, if these parties had taken $25,000, in twenty-dollar gold pieces, and deposited them in the bank to the credit of the company, and, upon producing evidence to the company of that fact, asked that its capital stock be issued to them to that amount, and it had been done.  The company did act upon the faith of this deposit, issued that amount of capital stock, and delivered the same to the parties by whom the bank, by its authorized officers, certified that it was made to its credit.  So much in answer to what is said in the brief of counsel for defendant, as to the company, but not the bank, being bound by the acts and declarations of Warden.  Warden, in the then embryonic state of the company, could not bind it by his acts or declarations.  It could not bind itself, although

it had attempted to do so, by resolution of its board of directors, authenticated by its corporate seal. It was yet "*in utero.*"

But at this critical period of its existence there comes upon the stage one whom no act or declaration of the company or any, or all of its officers, directors and stockholders combined could bind, the superintendent of the insurance department of the state. He comes not as its representative, but as its antagonist, as the representative of the state, appointed for the purpose of protecting the interest of the public; of all those who during the future existence of the company might have dealings with, and to whom it might incur obligations, he comes, and in the name of the state demands to be shown the cash capital stock which it has on hand, and on the faith of which it proposes to incur those obligations. The company responds, "It is not in the office, it is on deposit in the National Exchange Bank," and here is the deposit book showing the fact. As a faithful public officer charged with the protection of important interests, he must have additional evidence and he goes to the bank, which he finds in charge of its cashier and his assistants there, whom the bank has charged with the duty of receiving deposits passing them to the credit of those for whom they may be deposited, and furnishing the evidence to the depositor of the right to draw the amount deposited, and asks whether the company has any money in that bank. He is answered by the cashier, "on this sixteenth day of February, 1889, the Midland Accident Insurance Company has on deposit to its credit in this bank $125,000 in actual cash, deposited therein by the stockholders of said company as its capital stock." Satisfied now from the exhibit from the books of the bank produced by the company, and by the declaration of the officer in charge of those books, that the cash is

there and the law had been complied with, he issues his certificate authorizing the company to commence business; it springs into full-fledged life; he for the time being passes off the stage, and the company commences its business life with a rotten constitution; lives fast, and in less than a year becomes a hopeless invalid.

Again the superintendent comes upon the stage, in the same relation as before, not as a receiver or assignee of the company nor as its representative in any manner whatever, but standing in his own shoes, as the representative of the state, to protect the interests of those to whom this company had incurred obligations upon the faith of the authority that empowered it to exist and incur those obligations, and again he demands to be shown the cash capital or its equivalent, with which it commenced business. It cannot be produced, and he visits upon its head the penalty imposed by the law upon its recreant creature, and it passes out of existence. It then becomes his duty as the representative of the state to gather up what is left of that capital, whatever its form, or condition, and wherever it may be found, and to apply it to the discharge of those obligations. He again goes to the bank, and says: "Here! upon investigation of the business of this company I find that there is still in this bank $21,500 of its cash capital that has never been drawn out; I want it," and he is answered, by the defense set up in this suit, the substance of which is that although our books showed that on the sixteenth of February, 1889, this company had on deposit actual cash in this bank to the amount of $125,000, and the proper officer thereof in the line of his employment so certified, by the bank deposit book given to the company and exhibited to you and so declared to you, when you sought information of this bank upon which to base your official action, yet, really now, $21,500 of

that amount was not on deposit here at all; it was only made to seem so by that rascally cashier of ours for whose "*modus operandi*" see answer. The superintendent of insurance might well have replied: "Gentlemen, this answer will not do; the plainest principles of the law of agency and estoppel forbid it. You placed this rascally agent in charge of your books, and of this branch of your business; you authorized him to receive deposits and keep the bank's accounts with its depositors, and to declare the state of them; his representations in that behalf are your representations. I relied upon them and called this company into life. Upon the faith of the existence of this cash capital in your bank as represented, I acted, and obligations of the company have been created upon the faith of that cash credit which it is my duty to protect. You cannot now say, ' This money was not here;' you must account for it,'' and so say we.

The judgment is for the right party and is affirmed. All concur.

### SEPARATE OPINION.

BARCLAY, J.—Concurring in the conclusion announced by my learned associate it yet seems proper to observe that, in my opinion, the insurance company itself might, if a going concern, assert and maintain a claim to the fund in question, on the admitted facts.

It does not appear necessary to go into the reasons for this opinion further than to say that the stock of the insurance company was issued in consideration of that fund, and there is nothing in the surrounding facts to defeat its right to hold that consideration as against the bank.