## McFarland v. The Missouri Pacific Railway Company, *Appellant*.

### In Banc, December 4, 1894.

1. **Railroad:** PERSONAL INJURIES: RELEASE: FRAUD. In an action for personal injuries sustained by plaintiff while a passenger on defendant's train, a release or "settlement" was pleaded as a defense, to which plaintiff replied that it had been procured by fraud and undue influence. On the facts stated in the opinion, it is *held*, that the reply was not sustained, and that the release is a bar to plaintiff's cause of action.

2. ———: ———: ———: ———. The fact that a release is obtained by a railway physician from a person injured in a railway accident, who is under treatment of the physician at the time, furnishes no evidence of fraud at law or in equity, where the patient knows that the physician is in defendant's employ, accepts payment of the consideration, and fully understands the contents and effect of the release, and the latter correctly describes the injuries received.

3. **Practice:** LEGAL AND EQUITABLE REMEDIES: FORUM. In Missouri legal and equitable rights and remedies are recognized and administered in the same court.

4. ———: ———: SEPARATE TRIALS. The trial court may direct separate trials of legal or equitable issues, if necessary to prevent confusion in deciding such issues.

5. ———: FRAUD: JURISDICTION. The jurisdiction of courts of law and equity with respect to remedies for fraud discussed.

6. ———: ———: ———: RELEASE. Courts should be prompt to afford redress in cases of real fraud in securing releases of damages, but equally firm in upholding such releases when they are fairly obtained.

7. Release: FRAUD: EVIDENCE. The fact that the plaintiff is ill at the time of executing a release, though it has an important bearing on the question of capacity to enter into the contract, is no proof of fraud, where the party admits a perfect understanding of the contract and of its effect on his rights.

8. ———: ———: ———: REPRESENTATIONS. Where representations, during negotiations for a contract, show on their face that they were not intended as statements of fact, but as expressions of expectation as to future occurrences, they do not amount to proof of fraud.

9. ———: ———: ———. In order to found proof of fraud upon representations of fact, it must be shown that the representations were false.

10. ———: ———: ———: CONTRIBUTORY NEGLIGENCE. Contributory negligence, though an affirmative defense, may warrant the court in taking a case from the jury where it appears from plaintiff's own evidence as a conclusion of law. The same rule applies as to proof of alleged fraud in obtaining a release.

*Appeal from Henry Circuit Court.*—HON. JAMES H. LAY, Judge.

REVERSED.

Plaintiff on the circuit recovered judgment for personal damages in the sum of $3,750. Defendant appealed.

The petition alleges negligence in the management of defendant's railway. The answer sets up a settlement of plaintiff's claim and payment of an agreed amount in discharge of plaintiff's cause of action.

The reply contains the following:

"Plaintiff admits that on the thirtieth day of June, 1890, while she was sick, sore and feeble both in body and in mind, as a result of the injuries complained of in her petition, and, therefore, in no condi-

tion, whatever, to know, and did not know her real condition, nor how badly she was hurt, nor what amount of damages she had sustained by reason of her said injuries, and while she was ignorant of her rights in the premises, of all of which the defendant was fully advised and well knew, she was induced by the officers, agents and servants of the defendant, to accept in full satisfaction of her damages, on account of the facts pleaded in her petition, the meager sum of $100, which amount she tendered back to the defendant as soon as she was sufficiently recovered to know and realize her true condition, and became advised of her rights in the premises, and which amount she now brings into court and here tenders back to the defendant.

"Plaintiff now says that as soon as the same could be done, after she was injured, as stated by her in her petition, she was by the officers and servants of defendant, taken back to the city of Nevada, and there placed in a hotel, where she was an entire stranger, and there kept until after defendant had procured the pretended settlement, pleaded by it, and obtained her signature to some receipt purporting to release defendant from liability to her on account of her said injuries, all of which was done and procured by defendant, for the purpose of defrauding her out of her just demands against said defendant, and defeating her of her lawful action against it to compel the payment of the same; and in making said pretended settlement, defendant, through its officers and servants, purposely and knowingly took advantage of the absence of the family advisers of this plaintiff, when they knew that plaintiff was in no proper condition to know what was proper to do, or to make any settlement about the matter of her said injuries; that the defendant, for the purpose of preventing the friends and family of plaintiff from

being present, and preventing any such settlement being made, and plaintiff thereby overreached, through its officers and servants, on the day before said pretended settlement was made, to wit, on June 29, 1890, in the afternoon of that day, through its officers and servants, stated to her brother and business agent and adviser, that the plaintiff was in no condition to settle with defendant the matters now in dispute in this action, and that as soon as plaintiff was sufficiently recovered to be removed safely to her home at Butler, and to make a fair and just settlement of her said claim against defendant, the said servant and officer of defendant would come to Butler and make a satisfactory and fair settlement of the same with the plaintiff and her brother; all of which facts were unknown to this plaintiff and by defendant's servants and officers purposely kept from the knowledege of plaintiff, but they, upon the other hand, then and there represented to her at the time of said settlement, that the said brother of this plaintiff had been consulted about the terms of the proposed settlement, and had consented to the same, all of which was false, and by said servants known to be at the time of making the same, and were made for the wicked purpose of deceiving and overreaching plaintiff in her then helpless condition, which said settlement, in the great haste of defendant to overreach plaintiff, was made in her room where she was confined to her bed in a helpless condition, even before she was permitted to have her breakfast, on the morning of June 30, 1890.

"Defendant's officers and servants then represented to her falsely that all other persons who had been injured in said wreck had settled with defendant, and she alone was the remaining one that had not been settled with, and induced the plaintiff to believe that there was no legal obligation upon the part of the

defendant to pay her anything, and studiously avoided informing her of her rights or her true condition, as was their duty to her while in the custody and care of defendant, as she was at the time; all of which was for the purpose of overreaching and defrauding this plaintiff out of her just demands against said corporation.

"Wherefore, the plaintiff prays that said pretended settlement be disregarded, and for naught held; and that she may have judgment as prayed in her petition, and for all proper relief."

The passages from the testimony of plaintiff, referred to in the opinion, are the following:

"*Q.* What doctor came to see you? *A.* Dr. Rockwood and the two doctors Callaway and Wilson.

"*Q.* Dr. Callaway and Dr. Wilson represented the railroad company? *A.* Yes, sir.

\*    \*    \*    \*    \*    \*    \*    \*    \*

"*Q.* When you first came there, did Dr. Rockwood tell you that he had orders from the railroad company to provide for you and take care of you until you were able to leave? *A.* Someone told me he was to take charge of us.

"*Q.* For the railroad company? *A.* Yes, sir.

\*    \*    \*    \*    \*    \*    \*    \*    \*

"*Q.* Now, on Monday morning, what time did you eat breakfast? *A.* Between 8 and 9 o'clock some time, I think. I don't remember just the time.

"*Q.* Between 8 and 9 o'clock? *A.* Yes, sir.

"*Q.* How long had you been to breakfast before Dr. Rockwood and Dr. Rogers came up to see you? *A.* About half an hour, I think.

"*Q.* They came up about half an hour after you had been to breakfast? *A.* Yes, sir.

"*Q.* Have you read over your testimony taken at the last trial of this case? *A.* No, sir.

"*Q.* Have you seen it? *A.* No, sir.

"*Q.* Will you state to the jury what took place when Dr. Rockwood and Dr. Rogers first came in your room on Monday after you had been to breakfast? *A.* Well, they came in the room, and Dr. Rockwood introduced Dr. Rogers as claim physician, and, as he walked around the bed, he said: "He is also a doctor." And they sat down, and Dr. Rogers examined me, and I think Dr. Rockwood did, too.

"*Q.* What kind of an examination did Dr. Rogers make? *A.* He only examined my chest. He didn't examine my limb.

"*Q.* How did he come to examine your chest; did you tell him that it was hurting you! *A.* No, sir; Dr. Rockwood told him about my injuries, how I was injured.

"*Q.* Did he tell him in your presence? *A.* I think he had told him before they came there.

"*Q.* Did you hear him tell him? *A.* I heard him say something about it.

"*Q.* You heard him describe how you were injured; that you were injured in the chest? *A.* Yes, sir.

"*Q.* And that you had spit up blood? *A.* Yes, sir.

"*Q.* And that your leg was hurt? *A.* Yes, sir.

"*Q.* And he then examined your chest? *A.* Yes, sir.

"*Q.* How did he examine it? *A.* He listened to it; put his ear down.

"*Q.* That is the only examination he made? *A.* Yes, sir.

"*Q.* He didn't undertake to prescribe? *A.* No, sir.

"*Q.* He put his ear down to see what he could hear? *A.* Yes, sir.

"*Q.* That is all he did? *A.* Yes, sir.

"*Q.* Did he make an examination of your limb? *A.* No, sir.

*Q.* Did Dr. Rockwood make an examination in the presence of Dr. Rogers? *A.* I think he examined my lungs, too.

"*Q.* He put his ear down? *A.* Yes, sir.

"Q. Was there any other examination made of your body at that time? *A.* No, sir.

"*Q.* Is that all that took place in regard to an examination of your person on Monday? *A.* Yes, sir.

"*Q.* You say that when Dr. Rogers first came in he was introduced by Dr. Rockwood as claim physician of the Missouri Pacific Railway Company? *A.* Yes, sir.

"*Q.* Might he not have been introduced as claim agent, and also stated that he was a doctor? *A.* No, sir.

"*Q.* You are certain about that? *A.* Yes, sir.

"*Q.* Might you not be mistaken about the language that he used? *A.* No, sir.

"*Q.* Were you listening? *A.* Yes, sir.

"*Q.* Don't you think it possible that you might be mistaken. *A.* No, sir.

"*Q.* Well, then, what occurred after that, after Dr. Rogers and Dr. Rockwood put their ears down and listened to your chest? Then what conversation followed? *A.* I don't remember just what was said next.

"*Q.* Didn't Dr. Rockwood state to you that he (Rogers) was claim agent of the Missouri Pacific Railway Company, and that he had come down to settle with yourself and other persons who were injured in the wreck? *A.* I don't remember whether Dr. Rockwood did or not.

"*Q.* Did Dr. Rogers say so? *A.* He said something about it.

"*Q.* You understood that he came there in behalf of the railroad company to settle up the damages with persons injured in the wreck? *A.* Yes, sir.

"*Q.* I will get you to state if he did not ask you at that time what was your age? *A.* Yes, sir.

"*Q.* What did you tell him? *A.* I told him that I was twenty-five years old.

"*Q.* Did he ask you if you transacted your own business? *A.* No, sir; I don't think he did.

"*Q.* Are you certain about that? *A.* I am not certain, but I don't think he did.

"*Q.* Did he ask you if you were capable of making your own settlement? *A.* I think not.

"*Q.* Was there anything said about that? *A.* I think not.

"*Q.* How did he come to ask if you were of age? *A.* I don't know.

"*Q.* You don't know how he came to ask you that? *A.* No, sir.

"*Q.* What was the next thing he said after he asked your age and you told him you were twenty-five years of age—then, what did he ask you? *A.* I don't think he asked me anything.

"*Q.* What was the next thing he said, after that? *A.* He said that Dr. Rockwood had told him that I was such a brave little girl that he wanted to do what was right about it; that he had settled with all the rest, and I was the last one, and that he had come to see me that morning, as he had settled with all the others Saturday night, and I didn't tell him what I would settle for. And, finally, he asked me if I would be willing to take $100, and I told him I didn't know—that I hadn't thought anything about it; that I only wanted what was right.

McFarland v. The Mo. Pac. R'y Co.

"*Q.* And what did he then say? *A.* I don't remember.

"*Q.* Did he then tell you that they would give you $100 and pay the doctor bills and the hotel bill and the nurse hire, and let you stay there at the expense of the company until you got ready to go home? *A.* He said they would pay the expenses.

"*Q.* And did he say that he would let the nurse stay there at the expense of the company until you were ready to go home? *A.* I think not.

"*Q.* He said they would pay all bills; the doctor bills and the hotel bills? *A.* Yes, sir.

"*Q.* And pay you $100? *A.* Yes, sir.

"*Q.* What did you tell him? *A.* I told him that I didn't know; that I supposed that would do; that I wanted only what was right.

"*Q.* Then he told you he would go down and get the money? *A.* No, sir; he had the money.

"*Q.* Did he have all of it—didn't Dr. Rockwood let him have about $10? *A.* I think he had all but about $10.

"*Q.* He then sat down and wrote out a receipt? *A.* Yes, sir.

"(A paper was here shown to witness, and she was asked):

"*Q.* Look at that paper and state whether or not it is the release or contract which you signed that day? *A.* Yes, sir; it is.

"*Q.* That is your signature at the bottom; *A.* Yes, sir.

"*Q.* You wrote your signature there, did you? *A.* Yes, sir.

"*By Mr. Railey.* I now offer this release in evidence for the purpose of cross-examination.

"*By Mr. Smith.* I think he is not offering his testimony yet.

"*By the court.*   I think that is a matter in his own discretion; it will be admitted for that purpose."

The release read to the jury in words and figures following, to wit:

"The Missouri Pacific Railway Company, to Minnie Lee McFarland, Dr., Address, Butler, Mo.

"In full settlement and satisfaction of all claims and demands against the Missouri Pacific Railway Company, its leased, operated and controlled lines of railway for personal injuries received as follows:   On June 28, 1890, while a passenger on Pass. Tr. No. 302, of said Co.'s said train was wrecked near Horton station, on the L. & S. Div. of said R'y, and I received severe cuts and contusion on my left leg, and a severe blow upon my chest and contusion upon my right leg.   The blow upon my chest was followed by spitting of blood.

"And I do hereby fully and forever release and discharge said companies from any and all claims of whatever kind or character I may have on account of, or arising from, said accident or injuries in consideration of the sum of one hundred dollars . . . . . 100.00.

"I certify that the above is a true copy of an original account rendered by Wm. E. Jones, G. C. A., duly authorized and approved for payment by S. H. H. Clark, First Vice-President; that the same has been examined by me and found correct; that it has been duly registered and filed in the Auditor's office.

"C. G. WARNER, General Auditor.

"By SID. B. SCHUZLER, Auditor of Disbursements.

"Received, June 30, at Nevada, Mo., 1880, of the Missouri Pacific Railway Company, one hundred no-100 dollars in full for the above account.

"Sign here:    MINNIE LEE McFARLAND.

"Witness here: .

"C. A. ROCKWOOD.

"CLARISSA J. MIZE."

"*Q.* How long did it take Dr. Rogers to write this? *A.* I don't know how long."

"*Q.* Ten or fifteen minutes? *A.* No, I think not.

"*Q.* "Did he write it in five minutes? *A.* I know he wrote it in a very short time.

"*Q.* After he got through writing it, did he hand it to you to read? *A.* Yes, sir.

"*Q.* Were you lying down at the time? *A.* Yes, sir.

"*Q.* And did you ask him to read it to you? *A.* I started to read it, but I could not raise my head off the pillow and the way the light shone I could not see, and he said, 'Miss McFarland, I believe you can't see. I will read it to you.'

"*Q.* And he read it to you? *A.* Yes, sir.

"*Q.* You knew what the substance of it was when you signed it? *A.* I knew it was releasing the company from all further obligations, but I couldn't hear it all. He didn't read it plain.

"*Q.* You knew at that time that you were releasing the company from all obligations on account of the injuries you had received in the wreck? *A.* Yes, sir.

"*Q.* In consideration of the payment to you of one hundred dollars, and their paying the bills? *A.* Yes, sir.

"*Q.* The description of the injuries; you say Dr. Rockwood gave him that? Yes, sir.

"*Q.* I will read this and get you to state if that is what Dr. Rockwood told him you were suffering with, 'A severe cut and contusion of your left leg; a severe blow upon your chest; a contusion upon your right leg; the blow upon your chest was followed by spitting of blood.' Is that what Dr. Rockwood described to him as your condition? *A.* Yes, sir.

"*Q.* And he wrote that in the voucher at the time? *A.* Yes, sir.

"*Q.* Is that really what you were suffering with at that time? *A.* Yes, sir.

"*Q.* That is what you claim now that you were suffering with? *A.* Yes, sir.

"*Q.* With your leg and lung? *A.* Yes, sir.

"*Q.* So this voucher describes your injury exactly? *A.* Yes, sir.

"*Q.* You knew what this voucher was for—that it was a release of your claim for damages. *A.* Yes, sir.

"*Q.* Mrs. Mize was present at that time? *A.* Yes, sir.

"*Q.* And Dr. Rockwood was present? *A.* Yes, sir.

"*Q.* What time was it when they got through making the settlement, and the one hundred dollars was paid to you? *A.* I don't think it was more than nine o'clock.

"*Q.* Wasn't it about 9 o'clock when you commenced? *A.* Perhaps it was.

"*Q.* Dr. Rogers was only there a short time? *A.* Just a short time; yes, sir.

"*Q.* He said that he was in a hurry to get off to see other parties, to settle with them? *A.* No, sir; he said that he had settled with all the rest on Saturday night, and they had all left but one old gentleman, and he left on Sunday morning.

"*Q.* Well, he told you that he was in a hurry to get off on the next train? *A.* Yes, sir.

"*Q.* When did he tell you that? *A.* When he first commenced to talk about a settlement.

"*Q.* That he was in a hurry and would have to get through for the trains? *A.* Yes, sir.

"*Q*. Had anybody said anything to you from the time you received the injury Saturday evening up to the time Dr. Rogers came there Monday morning, about the settlement of your claim for damages? *A*. No, sir.

"*Q*. That was the first conversation between yourself and anybody on the subject?  *A*. Yes, sir.

"*Q*. Or anybody else in your presence?  *A*. Yes, sir.

"*Q*. The first conversation was when Dr. Rogers and Dr. Rockwood came to your room on Monday morning following the accident?  *A*. Yes, sir.

"*Q*. Was there any other conversation between you and Dr. Rogers in regard to this settlement that you remember of now, before the settlement and up to the time of the settlement?  *A*. I don't remember of any more.

"*Q*. You stated that he did ask you if you were of age?  *A*. Yes, sir.

"*Q*. And you told him that you were twenty-five? *A*. Yes, sir.

"*Q*. Is it not possible that he might have asked you if you were capable of transacting your own business?  *A*. No, sir; I don't remember it.

"*Q*. Will you state that he did not ask you that? *A*. I don't remember.

"*Q*. He might have asked you that?  *A*. Yes, sir; he might.

"*Q*. And you may have told him that you were capable of doing your own business?  *A*. I don't think he asked me.

"*Q*. Were you paying close attention to the conversation?  *A*. Yes, sir, I was; just as well as I could at that time.

"*Q*. You think if any conversation of that kind had taken place, you would recollect it?  *A*. Yes, sir.

"*Q.* I will ask you if he did not also ask you in the presence of Mrs. Mize and Dr. Rockwood, if you would prefer to have your father or brother present when you made the settlement? *A.* No, sir, he did not.

"*Q.* Are you certain about that? *A.* I am certain that he never asked me anything of that kind.

"*Q.* You remember all the conversation that took place there? *A.* I remember a part of it.

"*Q.* Do you know of anything that you did not remember then? *A.* No, sir; I don't think I do.

"*Q.* Has there been anything to refresh your recollection since about it? *A.* No, sir; I just remember certain things.

"*Q.* I would like to have you commence and state in your own language all the conversation that took place between you and Dr. Rodgers and Dr. Rockwood at the time of the settlement?

"Objected to by counsel for the plaintiff, for the reason that he has been all over it. The question withdrawn.

"*Q.* After Dr. Rodgers paid you this money, how long was he there? *A.* He left just a few minutes after he paid the money.

"*Q.* And you turned the money over to Dr. Rockwood to put in the safe and keep for you until you got ready to go home? *A.* Yes, sir.

"*Q.* How long after the settlement before you became dissatisfied with the settlement? *A.* About two or three hours.

"*Q.* Was it not about half a day? *A.* No, sir.

"*Q.* I will ask you if you did not testify, on the trial of this case before, in answer to a question, in speaking of it, 'how did you happen to mention it? *A.* Because I thought I ought to have more than I got.

" 'Q. When did you come to that conclusion first? A. A short time after I signed that agreement.

" 'Q. How long afterward? A. It was that day.

" " 'Q. Well, let's get at it; how long after the settlement was it—how many hours? A. I don't know; I don't suppose it was more than a half a day, probably not so long.'

"Q. Now, was that correct? A. It was not longer than half a day and I think it was only two or three hours.

"Q. You came to the conclusion that you didn't have money enough? A. Yes; and the more I thought about it the more I thought I ought to have more.    .

"Q. You didn't think anything about being dissatisfied with the settlement until you talked with Mrs. Mize, did you? A. Yes, I talked with Miss Abell.

"Q. You talked with her first? A. Yes, sir.

"Q. What time in the day did you have the talk with Miss Abell? A. I don't remember.

"Q. Was it in the afternoon? A. It was after dinner.

"Q. Was it not about 2 or 3 o'clock when you had the conversation with Miss Abell? A. I don't remember.

"Q. It was after dinner, though? A. Yes, sir.

"Q. Who was present when you had the conversation with her? A. No one.

"Q. You think there was no one present? A. No, sir.

"Q. Where was Mrs. Mize then? A. I don't know where she was.

"Q. She was not in the room? A. No, sir; I think not.

"Q. What conversation did you have with Miss Abell about it? A. I don't remember what was said.

"*Q.* I will ask you if you did not state to the jury here, that you told her that you had settled your case against the company for damages on account of the wreck, and told her what he had settled for? *A.* I think some one else told her, but she knew it.

"*Q.* Did you repeat to her what you had settled for? *A.* Yes, sir.

"*Q.* And you told her you hadn't got money enough? *A.* Yes, sir.

"*Q.* And that is all you did say about it? *A.* Yes, sir; I think so.

"*Q.* Who was the next person you talked to about it? *A.* Mrs. Mize.

"*Q.* Are you not mistaken? Didn't you talk to Mrs. Mize about it before you did to anybody else? *A.* I think not.

"*Q.* You are certain about that? *A.* No, sir; I am not certain, but I think I talked to Miss Abell first."

The other facts necessary to an understanding of the case appear in the opinion.

*R. T. Railey* for appellant.

(1) Plaintiff having begun her proceeding in a court of conscience to set aside said release and settlement, and having voluntarily, against the protest and consent of defendant, abandoned said proceeding in equity, should not be permitted at law to relitigate the same matter. The court, therefore, erred in striking out the second count of said answer. Freeman on Judgments [2 Ed.], sec. 270; *Ogsbury v. LaFarge,* 2 N. Y. 114; *Borrowscale v. Tuttle,* 87 Mass. 377. (2) A court of equity alone has jurisdiction to set aside a release and settlement. The following authorities abundantly sustain this contention, and clearly set forth the

reasons in support of same: *Jackson v. King*, 4 Cowen, 270; *Johnson v. Co.*, 53 Fed. Rep. 572; *Fulliger v. Clark*, 18 Ves.   (3) There was no evidence adduced at the trial sufficient to authorize either the court or judge to disregard the release and settlement.   (4) The release read in evidence is a contract, and not merely a receipt.   It can not, therefore, be attacked except for fraud, and the evidence should be clear and convincing before it should be set aside upon the latter ground.   *McCormick v. Molburg*, 43 Iowa, 562; *Rose v. Railroad*, 12 Atl. Rep. (Pa.) 78; *McCall v. Bushnell*, 42 N. W. Rep. (Minn.) 545; *Mateer v. Railroad*, 105 Mo. 354; *Cummings v. Baars*, 31 N. W. Rep. (Minn.) 449; *Coon v. Knap*, 8 N. Y. 402; *Kellogg v. Richards*, 14 Wend. 116; *Morris v. Railroad*, 21 Minn. 91; *Parlin v. Small*, 68 Me. 290; *Brown v. Blunt*, 72 Me. 415; *Martin v. Bereus*, 67 Pa. St. 459; *Cannon v. Jackson*, 40 Ark. 417; *Sloan v. Becker*, 26 N. W. Rep. 730; *Ryan v. Ward*, 48 N. Y. 208; *Doty v. Railroad*, 52 N. W. Rep. (Minn.) 135; 1 Beach on Mod. Eq. Juris., sec. 71, and cases cited.   (5) The court should have sustained defendant's demurrer to the evidence because the consideration paid upon the settlement, admitted to have been signed by plaintiff, was not refunded.   It is conceded in the record that defendant paid to plaintiff $100 in cash, and also paid the additional sum of $100 for hotel, doctor and nurse bills.   Only $100 of said amount was tendered back, and that at the May term of court, 1891, when the suit had been brought on the thirty-first day of July, 1890.   Plaintiff not having rescinded the contract of release before bringing suit, by refunding to defendant the entire consideration received from it, is concluded by the release in an action at law regardless of all other questions involved.   *McMichael v. Kilmer*, 76 N. Y. 36; *Graham v. Meyer*, 99 N. Y. 613; *Baird v. Mayor*, 96 N. Y.

599; *Gould v. Bank*, 86 N. Y. 79; *Burton v. Stewart*, 3 Wend. 239; *Railroad v. Hayes*, 83 Ga. 558; *Thayer v. Turner*, 8 Metc. 550; *Kimball v. Cunningham*, 4 Mass. 502; *Evans v. Gale*, 17 N. H. 573; *Pierce v. Wood*, 3 Foster (N. H.) 519; *Herrin v. Libbey*, 36 Me. 357. (6) The release having been executed by plaintiff for a valuable consideration, with full knowledge of all the facts and of the legal effect of her act, while she was of sound mind and memory, and without any fraud, concealment, misrepresentation or imposition upon the part of the representative of defendant, she is concluded thereby. *Mateer v. Railroad*, 105 Mo. 350; *Doty v. Railroad*, 52 N. W. Rep. (Minn.) 135; *Gulliher v. Railroad*, 59 Iowa, 421; *McCall v. Bushnell*, 42 N. W. Rep. (Minn.) 545; *Rose v. Railroad*, 12 Atl. Rep. (Pa.) 78; *Coal Co. v. Whittaker*, 40 Kan. 129. (7) In an action at law the burden of proof does not devolve upon defendant to show the fairness of the transaction, in a case like the one at bar. *Gay v. Gillilan*, 92 Mo. 259; *Mateer v. Railroad*, 105 Mo. 321; *Co. v. Whittaker*, 40 Kan. 123; *Rose v. Railroad*, 12 Atl. Rep. (Pa.) 81; *Pederson v. Railroad*, 33 Pac. Rep. (Wash.) 351–354; *Johnson v. Co.*, 53 Fed. Rep. 570; *Co. v. Copple*, 22 S. W. Rep. 323; *Hawes v. Railroak*, 64 Iowa, 315; *Gulliher v. Railroad*, 59 Iowa, 420; *Jackson v. King*, 4 Cowen, 220; 3 Greenleaf on Evidence [15 Ed.], sec. 253; Story's Eq. Juris., sec. 238; Bigelow on Fraud, 123; 1 Beach on Mod. Eq. Juris., sec. 71. (8) The court erred in giving instructions asked by plaintiff.

*T. J. Smith, P. H. Holcomb* and *D. A. DeArmond*, for respondent.

(1) The abandonment of the equity court did not in the least prejudice defendant, and it can not,

therefore, complain. *Utley v. Tolfree*, 77 Mo. 307. (2) If the settlement was procured by unfair means, it was not necessary to go into a court of equity to have it set aside, before plaintiff could maintain her suit. She was properly permitted to plead in her reply the unfair or improper methods resorted to by defendant in procuring the settlement, or that it was obtained by undue influence. It was not necessary for her to set up in her amended petition the questionable means adopted to induce her to make it. This was expressly held in *State to use v. Smith*, 65 Mo. 469; *Girard v. Car Wheel Co.*, 46 Mo. App. 79. In the last mentioned case the right to try by jury, the issue of good or bad faith in the settlement, is distinctly recognized. See, also, *Kitchen v. Railroad*, 59 Mo. 514; *Vautrain v. Railroad*, 78 Mo. 44; *County v. Phillips*, 45 Mo. 75; *Smith case*, 69 Mo. 469, *supra; State to use v. Roberts*; 60 Mo. 403; *Owens v. Andrew Co.*, 49 Mo. 372. (3) If the settlement, whether evidenced by contract or receipt, be fairly made, it must stand; if not so made, it must fall. *Vautrain case, supra*, 78 Mo. 44; *Mateer v. Railroad*, 105 Mo. 320; Bispham's Eq., sec. 198; 1 Story's Equity, sec. 192; *Bank v. Crandall*, 87 Mo. 211. (4) There is no complaint in the answer that a tender was not made; and the record shows that the tender made was unavailing, and under no circumstances would have been accepted by the defendant, therefore not necessary. *Deichmann v. Deichmann*, 49 Mo. 107; *Harwood v. Diemer*, 41 Mo. App. 49; *Westlake v. St. Louis*, 77 Mo. 47. (5) There was no error committed by the trial court in the matter of giving instructions. (6) The damages were not excessive. (7) The evidence shows that at the settlement undue influence not only existed but was exercised. In fact we admit some difficulty in separating the two ideas, the one seeming to involve the other. But the char-

acter of the settlement—when made—where made—by whom made—the relation that Rockwood and Rogers sustained to plaintiff—her physical condition—her inexperience in business matters—amount paid her as a compensation—clearly indicated not only the abstract existence of undue influence, but the potential force of its exercise. The obnoxious weed was planted and watered and made to bear its fruit, by the diligent husbandry of defendant's over-zealous agents.

BARCLAY, J.—This is an action for personal injuries sustained by plaintiff while a passenger on defendant's railway. Her case is grounded on negligence; but the particulars thereof need not be gone into, for reasons which will appear.

The defense is an accord and satisfaction, or settlement of the plaintiff's demand. The settlement is evidenced by an agreement of release which has been quoted in full in the statement accompanying this opinion.

The statement also contains the material parts of the plaintiff's reply to the plea of a settlement, and those passages from her own evidence which bear directly upon the settlement, and the circumstances of it.

The substance of plaintiff's contention is that the settlement was obtained by fraud (in the respects alleged in the reply), and that it should form no barrier to her recovery upon the original cause of action.

Plaintiff's testimony tended to prove that while she was being carried on a train of defendant's railway, between Nevada and Butler, Missouri, the train ran off the track and was wrecked. Plaintiff received a blow of some sort in the chest, which caused her to spit blood for about an hour afterwards. Her left leg

had a cut about two inches long, and a piece of the flesh, about the size of a quarter of a dollar, was torn out. Her right leg was bruised. Those were her injuries.

She was removed by defendant's servants to a hotel at Nevada, immediately after the accident, and placed in the care of medical men employed by defendant.

All these things occurred June 28, 1890, which was Saturday.

Plaintiff's brother came from Butler to see her about 11 o'clock, P. M., that day. While he was at Nevada, Dr. Rogers told him that she was in no condition for a settlement, and would not be for a week or ten days, but that when she was better he would go to Butler and adjust the matter with him and her. The brother returned to Butler Sunday afternoon. At 1 o'clock the same afternoon Mrs. Mise arrived at the hotel at Nevada, and remained with plaintiff until Tuesday. Her home was at Butler, where plaintiff lived. She had known plaintiff for many years, and was with her when the settlement was effected. She signed the paper as a witness to plaintiff's signature, and corroborated plaintiff's account of that transaction in all of its important features. On Monday, the thirtieth, the settlement was made.

At the close of the testimony the defendant asked the court to declare the law to be that plaintiff could not recover on the facts. But the court refused that request, and the defendant excepted.

Among a number of instructions given at plaintiff's instance, we quote one as indicating the theory of the case adopted by the learned circuit judge, viz.:

"2. If the jury find from the evidence that after the injury to the plaintiff upon defendant's railroad, if she was so injured, she was taken charge of by the officers,

agents or servants of defendant, and taken to the Rockwood House, in the city of Nevada, Missouri, and placed in the custody of the proprietor thereof, Dr. Rockwood, and under his treatment; and if, while there, on the morning of June 30, 1890, the plaintiff was, in consequence of her injuries, in a weak and helpless condition; if such was the fact, and in the absence of the family of plaintiff, the agent or servant of defendant, in connection with Dr. Rockwood, solicited for defendant, and procured the making, by plaintiff, of the settlement and receipt in evidence; then the law presumes said settlement to be fraudulent and procured by undue influence over plaintiff; and the burden of proof rests upon defendant to show to your satisfaction that said settlement was fairly made, and said receipt freely given by plaintiff, with a fair knowledge upon her part, of the extent of her injuries, and the liability of defendant, if any, therefor, and that no trick, artifice, device, deception or other fraudulent means were used by either Dr. Rockwood, or said agent of defendant, whereby plaintiff was overreached or induced to make an unfair settlement, or receive an amount, thereon, grossly inadequate to reasonably compensate her for her injuries received in said wreck."

It will not be necessary to copy the other instructions in the view we take of the merits of the litigation.

The testimony of plaintiff herself is exceedingly clear and candid. She resorts to no subterfuge to conceal the truth. She frankly states it. Her account of the settlement is evidently sincere and straightforward. She admits that she understood the contents of the paper executed by her, and agreed to it. She admits that she knew it released the company from all further obligations to her on account of the accident. She admits that the paper correctly describes her injuries,

and the payment she received was in consideration of the release of the defendant from liability.

But it is claimed on her part by counsel that the paper is a fraud upon her rights, because it was obtained by a physician in attendance upon her, and because it was induced by misrepresentation of the extent and duration of her injuries.

Against this claim defendant, while denying the facts, advances the proposition that such objections to the settlement are not available by way of reply; that, until rescinded by the action of some tribunal, the release is a complete legal bar to the assertion of the plaintiff's original demand.

That proposition was urged upon the trial court in the pleadings; and finally at the opening of the trial in the form of defendant's objection to a trial by jury, on the ground that the question of settlement was one for the court to determine as a court of equity. But the learned circuit judge rejected that theory, overruled the objection, and submitted the case ultimately to a jury over defendant's exception.

It must be remembered that, while there is but one form of action in Missouri, under our code of procedure, the distinction between equitable and legal rights and remedies have not been obliterated. Those distinctions must be observed, for upon them depends, in many cases, the determination of the proper mode of trial, whether by court or jury, under the constitution and laws of the state. (Const. 1875, art. 2, sec. 28.)

Under our code it is the duty of the circuit courts to administer both legal and equitable rights and remedies, when necessary, in the same civil action. The trial court is armed with the discretionary power to direct separate trials, where the nature of the issues on the pleadings require them. (R. S. 1889, sec. 2134.)

The exercise of that power furnishes the remedy

for such confusion as might otherwise be brought about by the attempt to administer law and equity in the same forum.

Both law and equity as departments of general jurisprudence afford remedies to neutralize the effects of certain frauds.

The modes of procedure available in equity permit a direct attack upon a document, obtained by fraud, by process to cancel it. But at law the procedure treats the results of fraud as nullities, when the fraud has been ascertained, and passes on to judgment despite them. A court of law, upon finding fraud, passes over to the conclusion which it considers just; thus, in effect, discarding the fraud as an obstacle to its action.

In respect of many sorts of fraud, the jurisdiction of courts of equity and of law are concurrent. How that concurrence of jurisdiction came about is interesting historically; but the present case does not require us to rehash the materials gathered by the text writers on that subject.

Equity, as a code of conscience, takes cognizance of more delicate distinctions between right and wrong in human conduct and enforces a subtler morality than the traditional practice and procedure of courts of law have been considered capable of adjusting and administering. Hence in equity many acts are dealt with effectively as fraudulent, although they would admit of no remedy at law.

In this case, owing to some diversity of opinion here, we shall not attempt to decide (and we think it unnecessary to do so) whether or not the so-called release may be attacked at law or only in equity, since a majority of our number consider that, however the release be regarded, it can not justly be gotten out of plaintiff's way, in view of the testimony of her own witnesses, and particularly of herself.

1. The trial court treated the issue of fraud as one at law, and submitted it to a jury for decision. The instruction numbered 2, already quoted, presented the only theory on which the jury was asked to find fraud in the settlement. That instruction proceeded on the basis of a presumption of fraud in that transaction, growing out of the relations of the plaintiff as patient to Dr. Rockwood and Dr. Rogers as physicians and as representatives of defendant. The instruction required defendant to bear the burden of proving the transaction to have been fair and honest throughout.

Assuming, without deciding, that the instruction presented a correct rule of law, it seems very clear that the evidence of plaintiff herself (which must be regarded as in effect an admission) conclusively discloses that she was not taken advantage of, in the matter of making the compromise settlement. She well knew that the physicians in attendance were employed by the defendant. She fully comprehended the terms of the agreement, its scope meaning and effect. Her assent was fully and freely given at the time. She repented of it a few hours later. But, with commendable candor and sincerity, she states her reason for so doing, namely, that she thought she ought to have had more than she received as compensation. She kept the $100, however, until the following May when that sum was tendered to defendant on her behalf.

She was ill at the time of the transaction. That fact has an important bearing on the question of her capacity to enter into the contract; but, as her evidence establishes her perfect understanding and acceptance of the agreement, her illness can not, of itself, vitiate her act. She was of full age, authorized to act for herself, to bind herself and to conclude her rights in so doing.

The statements to her brother on Saturday night, that she was in no condition then to settle, etc., are not of a kind to sustain a charge of deceit. They were not made to plaintiff. She was told on Monday that the doctor had seen her brother and had a talk about the matter. But nothing more. That statement certainly formed no material inducement leading to the consummation of the settlment. Moreover, the statement, as made to her, was true.

Some hints are thrown out in the briefs as to the supposed fraudulent nature of other representations by defendant's physicians during the negotiations. They were not submitted to the jury for any finding, and require but very few words of remark.

It appears from some of plaintiff's witnesses that defendant's agents at that time declared, *first*, that they had settled with the other parties injured; *second*, that the company was willing to do what was fair and right, but if the matter got into the hands of lawyers and into court the parties usually did not get anything; and, *third*, that "plaintiff would be up and around in ten days or two weeks."

In point of fact, she was removed to Butler about ten days later, began to "limp around" in about one month, and in three months was walking as well as usual.

As to the first of these alleged misrepresentations (of settlement with other parties) there is no proof whatever of its falsity.

As to the last, it amounts to no more than an expression of opinion as to the probable duration of plaintiff's injuries. She admits that the exact nature and extent of her injuries are correctly stated in the release. The physicians told her she was hurt more than anyone else in the wreck, and in that connection they made the remark above quoted, as to the time

she might expect to get up again. The remark and its context show that it was not intended as a statement of fact. It was at most the expression of an expectation of something to occur in the future, over which the parties making the remark had no control. *Bowden v. Vanghan* (1808), 10 East, 416. There is not the slightest evidence that the remark was knowingly false or was made in bad faith. In the nature of things, the parties who made it, could not positively tell how soon she would be able to resume her usual duties. As to the second representation quoted, touching the probable fate of her claim if it came into litigation, the subject of it was, at least, a proper matter for her to consider.

The only fact of asseveration testified to in that connection is that "the parties usually didn't get anything." Whether that statement should be regarded as a mere argument to favor a settlement, or as a material representation inducing it, we need not pause to discuss. There was no attempt by plaintiff to prove its falsity as a statement of fact, and in the absence of any such proof, we can not assume that it was false, or intended to deceive or defraud.

Viewing the facts from any standpoint, we perceive no basis for a finding of fraud in reaching the settlement upon plaintiff's own showing. In that condition of the record, if the case be considered as one at law, the court should not have submitted that issue to the jury.

It is settled in Missouri that, though contributory negligence is an affirmative defense, if the fact of such negligence plainly appears as a conclusion of law from the evidence of the plaintiff himself, the court should then declare that he can not recover. So in the case at bar, if the instruction numbered 2 (as to the burden of proof) be assumed as correct, yet if plaintiff's own evi-

dence discloses, as we think it does, that the settlement was understandingly entered into, with full knowledge of its force and meaning and without any deceitful representations materially inducing it, the trial court should have declared that she could not recover.

We are of opinion that there was no substantial testimony tending to establish fraud in the procuring of the release, and that there was nothing to submit to the jury for a finding on that subject if the case be regarded as involving an issue at law only.

2. But if, on the other hand, the case be considered as cognizable only on the equitable side of the court, we are satisfied that the evidence does not warrant a cancellation of the instrument as a fraud on plaintiff's rights.

We need not again review the testimony in that connection. Our impressions of it fully appear from what has been already said.

Granting (without ruling) that the burden was on defendant to exonerate itself from the imputation of undue influence arising from the relations of the persons who took part in the transaction, we think the facts discharge defendant of that burden, and indicate affirmatively that plaintiff freely and voluntarily made the bargain with a thorough appreciation of its import, consequences and effect. She was competent to act for herself, and is too intelligent to be pronounced incapable of attending to her own affairs. She may have made an unwise bargain, but it was, we think, her free and lawful act.

While we should be very prompt to afford redress in cases of real fraud, we must be equally firm in upholding settlements and releases of this nature when we find them fairly obtained.

When papers of the sort here in question have been executed by parties with their eyes open—parties fully

understanding the meaning of their acts and fully advised as to the consequences thereof, we should not permit them lightly to avoid responsibility for such action.

In the circumstances exhibited in this case, the law does not attach to the making of contracts the privileges of repenting at leisure and thereby undoing them.

Upon the plaintiff's own showing, we consider that she has no ground, either in law or in equity, to avoid the release. Hence, we hold that the judgment of the trial court should be reversed. BLACK, C. J., and BRACE, GANTT, MACFARLANE, SHERWOOD and BURGESS, JJ., concur.