Robinson, J.
This is an appeal by defendant from an order of tbe circuit court, setting aside a verdict in its favor in a personal injury case.
The petition is in the usual form, charging injuries received by plaintiff while she was a passenger on defendant’s cars on the evening of October 1, 1889, by reason of a collision between cars running in opposite directions on defendant’s street car tracks in Kansas City. Defendant answered, setting up four distinct defenses. First, the jurisdiction of the court by reason of illegal service of process on it. Second, a general denial. Third, contributory negligence; and, fourth, a release in writing with seal executed by both plaintiffs, which release is in words and figures as follows:
“For the consideration of five hundred dollars, we, Mrs. Bertha Homuth and Erith Homuth, her husband, and each of us, do hereby' release and discharge the Metropolitan Street Railway Company from any liability, whatsoever, for any claim of whatever nature which we or either of us may have against said company, whether specifically enumerated or not, and particularly all claim for damage, loss of service, or expense arising out of, or connected with, an accident upon the car line of said road on October 1, 1889, on the Fifth street division, near Fifth and Bluff streets, in Kansas City, Missouri.
“In witness whereof we have hereunto signed our names and attached our seals this 22d day of October, 1889. Bertha Homuth. [seal]
“Erith Homuth. [seal]”
*634 A reply was filed expressly admitting the execution and delivery of the release, but averring “that the same was obtained by false and fraudulent representations, in that defendant’s surgeon attended and treated her, and, although he knew she was permanently injured, represented to her that she was not seriously hurt, but would be well in three weeks, and that the only settlement in fact made was for “the injury, suffering, loss, and damages to plaintiff, during the period of time from the happening of said injury to three weeks after the date of the execution of said pretended instrument of settlement.” The further averment is made that'on April, 1891, plaintiffs tendered to defendant $500 and interest thereon.
After the overruling of several ineffectual motions and demurrer filed by defendant, the court on defendant’s motion made an order that the issues1 as to the validity of the release be tried separate from the trial of the issue as to defendant’s liability, on the alleged cause of action as set out in the petition. The cause then proceeded to hearing upon that issue only, before the jury, and at the close of plaintiffs’ testimony defendant interposed a demurrer which was by the court overruled, and at the close of all the testimony offered in the case defendant again renewed its demurrer which was likewise overruled. The case was then submitted to the jury under instructions, resulting in a verdict and judgment for defendant. Plaintiffs in due time filed their motion for a new trial, which was granted for the alleged error in the giving of instruction numbered 4 as given at the request of the defendant herein, which we do not copy here, as it will not be discussed.
We will here give a statement of the facts out of which the case grows, together with the testimony of plaintiffs as it affects the matter of settlement and the *635 giving of the release pleaded and interposed by defendant, as a bar to plaintiffs’ cause of action.
October 1, 1889, Mrs. Homuth was a passenger on defendant’s street cars in Kansas City and received an injury in the nature of a sprain to one of her ankles from which she was unable to walk for several weeks, and on account of which she was unable to get around, except on crutches, for several months, according to her testimony. Plaintiffs at the time of the injury and for eight or more years previous thereto were running a stationery store in Kansas City, Kansas. Plaintiffs are Germans, but read and write English well, and were acquainted with the general manner of doing business in the city, and between them the books of the business were kept.
The day after Mrs. Homuth received her injury, Dr. Baum, a practicing physician of Kansas City, was called to see her and treated her up to the day of the settlement between plaintiff and the defendant, when the release offered in evidence was obtained, and during that time visited her every day, and was present at the time the settlement was made and the release was signed by plaintiffs, and signed same as one of the attesting witnesses.
Dr. Pettyjohn, the evening after the injury, called at plaintiff’s home, on behalf of the defendant, to ascertain the extent of Mrs. Homuth’s injury, and while there, in answer to a question by Mrs. Homuth as to the extent of her injury, in the presence of her physician, said that he thought that she would not have to remain in bed for more than five or six days.
At the request of plaintiffs, Dr. Pettyjohn again called to see Mrs. Homuth, the day her ankle and foot were put into a plaster of Paris cast, October 15, and was again to see her when the cast was removed on the twenty-third of October when the settlement was made *636 and the release signed, and then, again, in answer to a question by Mrs. Homuth as to when he thought her foot would be well, said, according to the testimony of plaintiff, “Well, I know there is no inflammation in the foot, and the foot will be well in fourteen days; because there is no inflammation in the foot, I think it will be well by that time, but here is your doctor, let him tell you.” Mrs. Homuth further testified, “Then my husband says ‘well’ he says, ‘then that will be on the sixth of November that she will be well and able to walk. Then we will say the. fifteenth of November, that will be about five weeks in all. I say then my bill is five hundred dollars.’ Mr. Windom then he came up and got the paper ready and gave it to me to sign and I signed it but I did not read it.” * * *
Then on cross-examination she testified as follows:
“Q. Now, how often during that month before you settled, was Dr. Baum with you? A. Oh, I think he came about every day.
■ “Q. What kind of treatment did he give you; what did he do for your foot? A. He bandaged it over first.
“Q. And applied liniments? A. Yes, sir; he put arnica and other things on the bandage and rebandaged it again.
“Q. When was it that Dr. Pettyjohn first came there? A. Well, on the second of October; that is where I have that down.
“Q. What time in the day? A. Well, they come about 10 o’clock.
“ Q. What time did Dr. Baum come? A. Well, I say it was either 9 or — I could not say.
“Q. Dr. Baum had been there before Dr. Petty-john came? A. Yes, sir.
“Q. You sent for Dr. Baum and while he was there Dr. Pettyjohn came? A. Yes, sir.
*637 UQ. You knew Dr. Pettyjohn was the company’s surgeon? A. I didn’t know. I was introduced to him as Dr. Pettyjohn and he told me he was the surgeon of the company.
“Q. You knew he was there for the company when he came to see you? A. Well, I didn’t know.
“ Q. When was the next time Dr. Pettyjohn was there? A. He was there on the next Saturday.
“Q. Do you remember what day of the month that was? A. Well, that little book shows it.
11Q. That was twice that Dr. Pettyjohn was there; when was the third time? A. The third time was on the twenty-third of October.
“Q. That is the time the settlement was made? A. Yes, sir.
“Q. Dr. Baum was there too, every day? A. Yes, sir.
11Q. Then he was there again on the twenty-third? A. Yes, sir.
“Q. Mr. Winton wanted to settle it all up? A. It seems so.
“Q. He wanted to settle the whole case? A. Well, he wanted to settle.
UQ. He wanted to settle the whole case up? A. Well I don’t know if he wanted to settle half or the whole.
ilQ. Your testimony was taken over here in the United States court? A. Yes, sir.
“Q. Weren’t you asked this question: ‘He wanted to settle the whole case up, didn’t he?’ and didn’t you say, ‘Yes, sir.’ A. I don’t know if I did or not.
“ Q. Did he say anything about wanting to settle half of the case? A. I did not know.
*638 “ Q. The first time that Winton was there did he make you any offer? A. No offer.
UQ. Did you tell him what you would take? A. I told him if I would be well before Christmas I would take a thousand dollars.
“ Q. When was it that you came down to $750? A. The same evening. I didn’t; it was Mr. Homuth.
“Q. You went and consulted with Mr. Homuth? A. Not any.
“Q. Didn’t you have any talk with Mr. Homuth about it? A. No, sir.
“Q. I will ask you if that was the same day, after consulting with your husband, you came down to $750? A. I didn’t consult Mr. Homuth nor did he me.
“Q. Was the offer to take $750 made in your presence? A. Yes, sir.
‘ ‘ Q. When was that — the first or the second time that Winton was there? A. The first time.
“Q. Who made the offer? A. Well, it was not an offer, really. Mr. Winton he figured on the nickels, how many passengers it would take, twenty passengers for every dollar — I know he figured into the thousands.
“Q. If he paid you a thousand dollars it would take twenty thousand passengers, wouldn’t it? A. I have not figured it up.
“Q. Well, you can figure pretty well? A. Yes, sir, sometimes.
‘ ‘ Q. Who was it that stated you would take $750? A. My husband.
“Q. Therein your presence, was it? A. Yes, sir.
“Q. Did you make any objection to it? A. Not any.
“Q. What did Mr. Winton say? A. He said, ‘Well, what was that.’
*639 “Q. Lid he say he would do anything about it? A. Not then.
“Q. He just rejected the offer? A. Well, what he say, he say he couldn’t do nothing unless he could see the company, but he hardly thought the company could pay it.
“Q. Well, he went off to see the company about it? A. So he say.
“ Q. Then he came back a second time, two or three days afterward. A. Yes, sir.
11Q. Were the doctors there the first time he was there? A. No, sir.
“ Q. Were the doctors there the second time Mr. Winton was there? A. No, sir.
“Q. Your husband was there both times? A. No; he wasn’t there steadily.
11Q. When was it that he was there? A. Well, he come and go, and it just happened as he was there.
UQ. Just happened to step in? A. Yes, sir.
UQ. You lived over the store? A. Yes, sir.
UQ. Your husband was staying down in the store while Winton was there, but he was in and out of your room? A. Yes, sir.
“Q. Now, the second time Winton was there, he offered you, first, $300, and then $350? A. Yes, sir.
ilQ. And you wouldn’t take that? A. No, sir.
UQ. What did you finally tell him? Did you say you would let him know when the doctors took the plaster of Paris off? A. Well, we would see what we could do.
“Q. On the twenty-third was the day you took the plaster of Paris off, was it? A. Yes, sir.
liQ. Was Winton there that morning? A. Yes, sir.
“Q.‘ Was your doctor there and the company’s doctor there that morning? A. Yes, sir.
11Q. Now, when the cast was taken off what did *640 Dr. Pettyjohn say? A. Dr. Pettyjohn said the foot •would be well in fourteen days.
“Q. Give us the language — how he said it? A. Well, there was no inflammation of' the foot, as much as he could see.
“Q. What did your doctor say about it? A. He repeated the same words that Dr. Pettyjohn used.
“Q. He thought the same thing that Dr. Petty-john did? A. It seems so.
“Q. How long was that after they had taken the plaster of Paris off? A. It was the same time, while Mr. Winton was there.
‘ ‘ Q. Well, your husband stated there in your presence that you would settle for $500? A. He say not that I would settle. .
“Q. What did he say? A. He say, ‘If she gets well in fourteen days — that would be on the sixth of November — but,’ he say, ‘we will say until the fifteenth, that would be going on the six weeks, or nearly so; then my bill will be $500.’
And you didn’t say anything at all? A. Not a word.
“Q. You heard that? A. I heard that.
“Q. What did Mr. Winton do? A. He got up and got his papers out of his pocket and gave them to me to sign.
Did you sign the paper? A. I signed it.
“ Q. Did your husband sign it? A. He signed it.
“Q. Did anybody sign it as witnesses? A. The two doctors.
“Q. As soon as the paper was signed did you and your husband talk it over to yourselves? A. No.
“Q. Did you ask anybody to let you read this contract over before you signed it? A. No, sir.
*641 'lQ. You didn’t ask'to read it, did you? A. No.
“Q. When did you quit carrying crutches? A. I think it was on the twenty-third of March for the first time that it just happened that I was in the store, and I-”
“Q. What year was that? A. 1890.”
Erith Homuth, the husband and co-plaintiff with Bertha Homuth, then testified:
“Q. Now, the twenty-third came around, and your doctor, Baum, and our doctor, Pettyjohn, and your wife and Mr. Winton were all there? A. Yes, sir.
“Q. The plaster Paris had been taken off and the leg bandaged up again? A. Yes, sir.
“Q. What was said while you were there? A. It was stated — Dr. Pettyjohn stated that it would take fourteen days and the foot would be well. There was no inflammation in it.
“Q. Your wife would not take his word for it? A. No.
11Q. What did she say about that? A. She didn’t say anything, but Dr. Pettyjohn say, ‘There is your doctor.’
“Q-. Well, what did your doctor say? A. He . say the same.
“ Q. And you thought it would be well in fourteen days? A. Yes, sir.
“Q. Then who said anything about $500? A. Myself.
“ Q. What did you say? A. As both doctors say it would be well in fourteen days, so I say, ‘In fourteen days will be the fifth or sixth of November; make it one week longer and say about the twelfth, and if it is well at that time then my bill is $500.’
UQ. Well, who said anything about signing a contract? A. Mr. Winton took the contracts out of *642 his pocket and went to the desk and changed the figures from $300 to $500, and gave it to my wife to sign it.
“Q. Did your wife sign it? A. Yes, sir.
“Q. Did you sign it? A. Yes, sir.
“Q. Did you know what was in this paper when it was signed by you? A. Possibly.
“Q. When was it that you read it over? A. I read it over before I signed it.
“Q. After Mr. Winton took it out of his pocket, and on that same day? A. Yes, sir.
“Q. What did the doctors sign it for? A. I don’t know.
“Q. Were you there all the time from the time he took the paper until you finally got it settled? A. Maybe I was there; maybe I went down stairs and came up again, and went down and came up again.
l‘Q. Then, maybe you were not there all the time and if it was read it was when you were down stairs? A. It wasn’t read from the time he took it out of his pocket and the time it was signed by my wife and myself.
“Q. Were you there all the time? A. Yes, sir.
“Q. Did you read it over before you and your wife signed it? A. I don’t remember.
“Q. Who signed it first, you or your wife? A. My wife.
“Q. Now, when was it that you knew your wife was not going to get well on November 15? A. When November 15 came around she wasn’t well.
“Q. So you knew it wasn’t true that she was going to be well at that time? A. I knew it; I saw it.
“Q. What did you do with the money you got from the company? A. I kept it in the bank.
“Q. When did you use it? A. 1 don’t remember.
*643 “Q. How did you use it? A. I paid it out in business.
11Q. 'You have been conducting business there ever since? A. Yes, sir; I have.
“Q. Did you use any of the money after the fifteenth of November, or did you use it all before? A. I can’t say.
“Q. Now, when Dr. Pettyjohn took that thing off the foot he said he thought it would take fourteen days for it to get well? A. Yes, sir.
“Q. What time did he say before that he thought it would take it to get well? A. The first time he said he thought it would take six days, and afterwards he said again ten days, and the third time he said fourteen days.
“Q. What was his exact language, that he thought it would take that long? A. He say, ‘It will be well’in fourteen days.'’
“Q. He didn’t say he believed it would be well in that time? A. I don’t think so; I don’t remember. It is two and a half years.
“Q. Did Dr. Baum say the same thing? • A. Yes, sir.
“Q. Who did Dr. Pettyjohn address when he told you to ask your own doctor about it; did he say that to you or your wife or both of you? A. Me and my wife were sitting there and he say, ‘Ask your doctor,’ that’s all he say.
“Q. That was before you had agreed on the $500? A. Yes, sir.
‘ ‘ Q. And after the doctor said he thought it would get well in fourteen days the settlement was made? A. Yes, sir; then I say, make it one week longer, and if she gets better by that time, my bill will be $500.”
*644 This covers the substantial points of the testimony as given by plaintiff as to the matter of the settlement and the signing of the release pleaded by defendant.
I. In the view we take of the merits of the litigation, from the admitted facts, as gathered from plaintiff’s testimony, which we have copied quite full in this opinion, in order that our ruling may be fully understood, we think it a matter of no concern what error was- made by the court in the giving of instruction numbered 4 for the defendant. Nor is it necessary to discuss the question as to the effect of the release on plaintiff, until a tender of the money back,' that was received thereon by them; or whether a release could be avoided in a suit at law by only one of the parties, where two causes of action held by two persons had been settled in the one release, or the question as to the right of rescission after using and keeping money after the fraud is discovered, and -numerous other questions’ that have been discussed by counsel in their very able and elaborate briefs filed in the case.
While this is a suit at law, in which all issues of fact triable are to be determined by the jury, when the facts as disclosed by the testimony of plaintiffs themselves, as in this case, entitled them to nothing, or when they admit the existence of the defense as set up by the defendant, the jury have no office to perform. Ariel when the court delegates to the jury a work that it should have done, and in doing so it gave an erroneous instruction, and the jury proceed thereunder, and make a finding for the right party, as the court should have done without them, no error has been committed authorizing the granting of a new trial “notwithstanding the error in instruction.” It is the settled doctrine of this court that if upon the pleadings and undisputed facts the judgment is for the right party, there can be no reversal no matter what errors intervened upon the *645 trial. Orth v. Dorschlein, 32 Mo. 366; Ellerbe v. Bank, 109 Mo. 445, and others. Then upon the same principle, if the judgment is for the right party upon the undisputed or admitted facts in the trial court, that court should not disturb the verdict and judgment thereon, notwithstanding error in instructions was made by it. Kelly v. Railroad, 88 Mo. 534; 30 Mo. App. 309; 29 Pac. Rep. 749. It is clear that plaintiffs were not taken advantage of in the making and signing of the release contract read in evidence, and set up in defendant’s answer.
In fact, they both say they were not. The husband read it, and both plaintiffs knew what they were signing, knew every word that it contained, and knew the force and effect thereof, and must be presumed to have thereby intended to have accepted the $500 therein named in full satisfaction for all claims for damages, as therein expressed; and they only now seek to avoid its force, by saying that “they received it in full for all damages done, believing that Mrs. Homuth’s injuries would be well in three weeks after the date of the settlement,” from an opinion to that effect expressed by defendant’s surgeon, corroborated by that of her own physician.
While fraud vitiates all transactions, and mistakes as to facts will rob contracts of their apparent validity, what fraud or mistake has been shown to relieve plaintiff from the binding force of the contract of release pleaded, and admitted by plaintiff to have been signed by them! There is not one word of testimony in the case from which a jury would be authorized to conclude that anyone for defendant made any fraudulent representations to plaintiffs or either of them, to induce a settlement or to sign the release pleaded by defendant-as a defense to this action. The injury both plaintiffs saw and thoroughly understood as far as injuries of *646 that kind can be known to the common observer and experiencer of them. • Both plaintiffs asked defendant’s surgeon, knowing at the time the position he held with the defendant company, when he thought Mrs. Homuth would be well and able to be out, and he said, “in fourteen days,” and at the same time remarked, “here is your physician, ask him his opinion,” and then and there the physician of plaintiffs corroborated the opinion of defendánt’s surgeon. The question could not have called for more than an opinion from the surgeon, as to the probable duration of her trouble, for plaintiff must have known as well as the surgeon, that when an injury of that kind will become entirely well must depend upon many conditions more in the knowledge and control of plaintiff than that of the surgeon whose opinion is sought.
Plaintiffs must know that there are no fixed rules in surgery by which the day, week or month can be calculated for the recovery of an injury to a member of the body under any and all circumstances. Constitutional infirmities, hidden maladies, unknown to physician or- surgeon, special manner' of treatment, the nervous temperament, the mental and physical idiosyncrasies of the patient, all constitute elements in the calculation (or more properly said the guess) of time when a given injury by way of a strain or injury, of the kind received by Mrs. Homuth, will be entirely restored. All that can be said by the physician, is “that all things being favorable as I now understand the situation, it is' my judgment that this or that injury will probably be well in one or two or three or more weeks or months.” We do not mean to say that a statement could not be made by a physician to his patients that would be so grossly out of harmony with the real or probable condition of things or what an ordinary common observer or physician would say, *647 under like circumstances, as to warrant the conclusion that they were falsely and fraudulently made; and that a, false hope might not be built upon it so as to induce the patient into signing some unreasonable undertaking, or releasing some valuable right, that would warrant a court under proper proceedings to relieve the patient from the binding force of his or her act.
There is in this case, however, nothing to show but what the opinion of the surgeon that “Mrs. Homuth would be up in fourteen days” was made in the utmost good faith; in fact, plaintiffs own physician at the time gave it as his opinion that she would be up by that time, and we must presume .that the opinion and expression of it, was honestly made until its falsity is shown.
Her protracted lameness until several weeks after November 15, when she was to be well, according to the surgeon’s opinion, but illustrates the disappointment, and the expectation unrealized in every household of our land, built upon the ever hopeful judgment, the invigorating and inspiring prediction of the family physician in hours of trouble and affliction.
The full extent and nature of her injuries were known at the time of the settlement. No unexpected trouble developed afterwards as a result of the injury to Mrs. Homuth which was not taken into account at the time of the settlement. The injury to the foot and ankle was the matter of settlement, the same injury and no more is the subject of this litigation. The injury has been settled for, plaintiffs got their money, signed the contract of release, discharging defendant company from all liability for all claims for damages, loss of service, etc., arising out of or in connection with the accident of October 1, and now ask the court to relieve them from the force of the receipt and release, merely because the injury was of a more perma *648 neat character, or more severe and obstinate than, they, their physician and the surgeon of defendant had at first thought it would be. In other words, what they were lacking in judgment in their first calculation as to the time Mrs. Homuth would be absent from her business in the store, plaintiff wants the defendant by the power of the courts to make good in dollars and cents.
It has been repeatedly held in this state, and in fact is a general rule of practice through the courts of our country, that the issues raised by a reply impeaching the integrity of the release pleaded by an answer, as having been obtained by fraud, might be tried in an action at law without a resort to a court of equity for a cancellation of such release.
In such cases the fraud being established the court treats the instrument as if nonexisting, and discards it as an obstacle in the way of the inquiry on the issues raised by the petition and the denial of its merits. No instrument in that case exists calling for the interposition of a court of equity, to annul, avoid or cancel. The admitted signature, is to no agreed contract, and without a contract agreed, the signature stands for nothing. The fraud under these circumstances robs the paper of any legal existence, saps it of its apparent vitality as a thing of life and leaves it as a withered form, unavailing and worthless to its procurer as a bar to the assertion of a just demand by the defrauded.
Not so, however, in this case, where the signatures are admitted, where the contents have been read and when its full purport is understood. Under such circumstances courts of law must accept them as binding between the parties.
II. Where, as in the case at bar, defendant has ’ performed its part of the contract of the release pleaded, and interposed it as a bar to the present action, and *649 plaintiffs admit its execution, knowing at the time thereof its legal effect, they can not escape the legal bar created thereby. McFarland v. Railroad, 125 Mo. 253; 28 S. W. Rep. 590.
To get rid of such an instrument, resort must be had to a court of equity. Until the instrument is annulled by a decree to that effect, its vitality will remain unimpaired, its integrity unimpeached, and it can be interposed, as a legal' bar for all damages that have been liquidated thereby. Johnson v. Merry Mount Granite Co., 53 Fed. Rep. 569; Vandervelden v. Railroad, 61 Fed. Rep. 54, and cases there cited. It will ever stand between the parties as a legal contract of settlement, in an action at law upon the original cause of action, and courts of law are bound to construe and enforce it according to its legal effect and not according to the view a jury might take of it as a contract of equality and right, in the light of the present surroundings.
It follows from what has been said that the order of the circuit court in awarding to plaintiffs a new trial is set aside, and reversed, with directions to enter judgment upon the verdict, for defendant.
G-antt, Sherwood, Burgess, and Macearlane, JJ., concur. Brace, O. J., and Barclay, J., concur in the result.