## STATE ex rel. CARDWELL, Respondent, v. STUART, et al., Appellants.

### St. Louis Court of Appeals, March 21, 1905.

1. **ADMINISTRATION: Claim by Administrator Against Estate.** The fact that an intestate owed the administrator more than the value of the estate did not excuse such administrator for his failure to inventory, and account for, all the money collected; he should have presented his demand for allowance in the probate court.

2. **CAUSE OF ACTION: Compromise Agreement: Fraud.** Before the enactment of section 654 of the Revised Statutes of 1899, where a cause of action was settled by an agreement obtained by fraudulent representations, the party in whose favor the cause of action existed then had two separate and distinct causes of action; the original cause of action and the cause of action to annul the compromise agreement on the ground of fraud; the proceeding to annul the compromise agreement was regarded as a distinct proceeding, whether separately pleaded in the petition or in reply to the defendant's answer setting up the compromise agreement.

3. ———: ———: ———: **Reply.** But under section 654 Revised Statutes, 1899, the validity of a compromise agreement set up in an answer to a cause of action may be questioned on the ground of fraud in the reply and the question of fraud becomes an issue to be tried with the original cause of action, it is a confession and an avoidance of the answer.

4. ———: ———: ———: ———: **Limitation.** Therefore the Statute of Limitations, section 4273, does not apply to affirmative relief demanded in a reply which seeks to annul, for fraud, a compromise agreement set up on the answer; the right to such relief is not barred until the statute of limitation has run against the original cause of action.

Appeal from Audrain Circuit Court.—*Hon. Houston W. Johnson,* Judge.

AFFIRMED.

*Fry & Rodgers* for appellant.

Plaintiff's claim that the release was obtained by reason of false representation, is barred by the Statute of Limitations and plaintiff cannot recover. The receipts and release were executed July 26, 1893. While the suit on the bond was instituted August 8, 1896, the claim that the release was obtained by fraud was first pleaded by plaintiff's amended reply filed September 21, 1903. Abst. page 12.

In the former decision of this court, State ex rel. v. Stuart, 74 Mo. App. 182, and 102 Mo. App. 26, this court held that fraud had not been plead and that "there was not a ray of evidence tending to impeach the settlement." Therefore this new claim of fraud was plead for the first time on September 21, 1903, more than ten years after the receipts were executed by the relator herein and more than six years after plaintiff filed his petition. This amended reply filed September 21, 1903, seeking to set aside the receipts, which this court in 74 Mo. App. 182, held were an acquittance sets up a new cause of action, wholly differrent from any claim previously asserted, against which the Statute of Limitations of five years had fully run before the amendment was filed. Such new cause of action was therefore barred. Sec. 4273, Subdivision 5th, R. S. Mo.1899; Buel v. Transfer Co., 45 Mo. 562; Courtney v. Blackwell, 150 Mo. 271, 51 S. W. 668; Sims v. Field, 24 Mo. App. 557; Phillips v. Broughton, 30 Mo. App. 148; Bricken v. Cross, 163 Mo. 449, 64 S. W. 99; Baker v. Railroad, 34 Mo. App. 98; Bernard v. Mott, 89 Mo. App. 403, 408; Railroad v. Wyler, 158 U. S. 285; Blake v. Minkner, 36 N. E. 246, (136 Ind. 418.) ; Mumford v. Pulman, 41 N. E. 617, (157 Ills. 258.) ;Fish v. Farewell, 43 N. E. 367, (160 Ills. 236.) ;Eylenfelt v. Steel Co., 46 N. E. 266, (165 Ill. 185.) ; Railroad v. Schrader, 44 Pac. 1093; Water Co. v. Hill, 26 Pac. 412; Jones v. Bull, 36 S. W. 501 (Texas) ; Coal Co. v. Broyle, 32 S. W. 761 (Tenn.) ; Smith v. Railroad, 50 Fed. 760.

*P. H. Cullen, George Robertson* for respondent.

(1)   Under the evidence and the law of this case the plaintiff is entitled to recover, for the administrator is bound to account to the heir for money coming into his hands.   Sherwood's Administrator v. Hill, 25 Mo. 391; Simmons v. Ellis, 17 Mo. 470; Scudder v. Hines, 89 Mo. 499; Am. Law of Ad. (Woerner) Vol. 2, sec. 519.

(2)   The failure of the administrator to inventory the whole of the estate is a sufficient fraud within itself to set aside the settlement.   Houts v. Shepard, 79 Mo. 141; Smiley v. Smiley, 80 Mo. 44.

The receipts taken by the defendant, Stuart, from the plaintiff were a nullity further than to show the amount received by the heir.   Lingenfelder v. Brewing Co., 103 Mo. 503, 15 S. W. 844; Swigert v. Hancock, 25 Mo. App. 596; Willis v. Gannill, 67 Mo. 730; Beach on Mod. Law of Con., Vol. 1, sec. 158, note 5.

## STATEMENT.

Though the facts of this case have been stated in previous decisions, it will be more convenient to those who may have occasion to read the opinion on the present appeal to restate them.   It is an action on the bond of William Stuart as administrator of the estate of Rachel Stuart (once Rachel Cardwell) deceased.   The action is against Stuart and one of his sureties.   The relator Charles Cardwell, is the son and only heir of said Rachel by her first husband.   She was married to Stuart in 1890 and died intestate, April 22, 1893.   Stuart qualified as administrator of her estate May 16, 1893 and filed in the probate court of Audrain county an inventory and appraisement of the assets, July 8, 1893.   The appraisement fixed the value of the assets at $750.   Stuart's final settlement was filed September 17, 1896, approved the same day and he was discharged as administrator the next day, September 18th.   The final settlement was as follows:

"To amounts received per inventory . . $750.00

By cash costs ............................. 2.50
By cash publication of notice ................ 7.50
By cash note of W. R. Kemp................. 58.00
By cash paid C. C. Cardwell ............... 750.00
     Total paid out................. $818.00"

The original petition in this case was filed August 8, 1896, and an amended petition, not very different from the original one, August 29, 1902. The latter pleading states, in substance, that the relator is the sole heir of Rachel Stuart; that at the time of the death of said Rachel she was possessed of the sum of $2500 in money, notes and other personal property; that William Stuart qualified as administrator of her estate, and furnished a bond in that capacity which provided that if Stuart should faithfully administer the estate of the deceased, account for and deliver all money and property belonging to it, and perform all other things touching his administration, required by law or ordered or decreed by any court having jurisdiction, the bond should be void; otherwise remain in full force. The petition then proceeds to state a breach of the condition of the bond, as follows:

"That the said William Stuart only inventoried the sum of seven hundred and fifty dollars and accounted only for the sum of eight hundred and twenty dollars as belonging to and as the estate of said deceased, and by virtue of his office as administrator of said estate, he took into his charge and into his possession as such administrator the entire sum of two thousand five hundred dollars, which he retains and has converted to his own use and refuses to account for in the probate court of Audrain county.

"Plaintiff further says that although the said defendant, William Stuart, has been requested and importuned to inventory the whole of said estate, he refused to do so, and retains one thousand seven hundred and eighty

dollars belonging to said estate and which would go to said Charles Cardwell upon the final distribution of said estate, as the sole heir of said deceased. Said estate is not indebted or otherwise involved.

"Wherefore, plaintiff says that he is damaged in the sum of one thousand seven hundred and eighty dollars and interest thereon at the rate of 6 per cent per annum since the 16th day of May, 1893, for which he asks judgment and costs. A certified copy of said bond is herewith filed and made an exhibit to this petition."

The answer filed September 15, 1902, contained a general denial of the statements of the petition and also special defenses, all of which need not be noticed; but one is important and we copy the allegations in regard to it:

"For another and further answer to plaintiff's amended petition, defendants state that long prior to the final settlement of said estate as aforesaid, on July 23, 1893, in consideration of seven hundred and fifty dollars, cash, paid by said defendant, William Stuart, to the relator herein, and for other good and valuable considerations, said relator, Charles Cardwell, did in writing duly executed, sell, transfer and assign to the said William Stuart, his entire interest in said estate, so that from and after said last named date, the relator had not and has not now any interest in said estate.

"Defendants further say that this defendant, William Stuart, relying upon said action on the part of said relator, the defendant William Stuart as such administrator, did on the 23rd day of July, 1893, receive from said relator a final receipt in full payment and satisfaction of his, said relator's share and interest in said estate, this defendant at the time advancing and paying to him, said relator, $750 cash, which said written receipt said defendant filed with his final settlement in said probate court, and he was on September 17, 1896, by said court discharged as such administrator.

"Defendant therefore, states that said relator had

no interest in said estate, and has not been and could not be, damaged as claimed in plaintiff's said petition, and is not entitled to recover, and defendants ask for judgment for costs."

To the answer a replication was filed October 4, 1902, containing the following allegations regarding the special defense above stated:

"Plaintiff further replying, denies each and every allegation as made and set up in defendant's fifth defense, and specifically denies that this plaintiff did, in writing duly executed, sell, deliver and assign to said William Stuart his interest in said estate or any part thereof. And plaintiff further says that the said defendant, William Stuart, as such administrator, did pay him the sum of $750 in part payment of his interest in said estate, but said plaintiff has never received from said administrator but the sum of $750, and there is still a balance coming to him, as alleged in his petition. Plaintiff further replying, denies each and every allegation of defendant's answer, and having fully replied, prays judgment as at first asked in his petition."

On September 21, 1903, an amended replication was filed, in which the documents alleged in the answer to have been executed by the relator to Stuart in release of relator's interest in his mother's estate, are copied and accompanied by the statement that though Stuart, as administrator, had paid relator the sum of $750 in part satisfaction of relator's interest in the estate, he had never paid a further balance which was owing. The replication specifically denies that relator ever sold and assigned his interest in his mother's estate to Stuart; states that the two instruments purporting to release his interest were both executed at the same time and as the same act; that they were executed and delivered on the representation of Stuart that there was only $750 in the estate and that sum was all that was going to the relator as sole heir of his mother; that relator believed said representation and relied on it and was induced by such

belief to execute and deliver the receipt and release; that said instruments were without any consideration whatever, except the payment by Stuart of the sum of $750, which Stuart then owed relator and which was only a part of the amount he owed; that said receipt contains words which are a badge of fraud; that the instruments were drawn up and prepared by W. W. Fry, one of the sureties on Stuart's bond, and a defendant in this action, and the execution of the said receipts by relator, the settlement in connection therewith, the payment of the $750 covered by the receipt and release, and all the transactions between the relator and the two defendants Stuart and Fry, occurred while Fry was acting as Stuart's attorney; that on account of these facts, the instruments pleaded in bar of plaintiff's action are fraudulent and void and do not release Stuart from further accounting to the relator for the relator's interest in his mother's estate.    It should be stated that the petition avers that the money alleged to have remained in the hands of Stuart as administrator, would all go to relator on final distribution, as the estate is not indebted.

The instruments relied on as assignments of relator's interest in his mother's estate are as follows:

"Mexico, Mo., July 26, 1893.

"Received of William Stuart, administrator of the estate of Rachel Stuart, deceased, $750, in full payment and satisfaction of my share and interest in the estate of Rachel Stuart, deceased, as a child and heir of said deceased.

"C. C. CARDWELL."

"Mexico, Mo., July 26, 1893.

"In consideration of William Stuart advancing to me my interest in the estate of Rachel Stuart, deceased, and this day as administrator of the estate of said Rachel Stuart, deceased, advancing and paying me my said interest, $750, in said estate, I hereby obligate myself not to question or require said William Stuart to

pay to said estate any money claim that I may think he owes said estate, or take any proceedings in court or otherwise claiming William Stuart owes said estate anything, but accept this $750 in full of my interest.

"C. C. CARDWELL."

The relator Cardwell testified that one day in the summer of 1893, he asked Stuart for some money out of the estate. Stuart said they would go down to Mr. Fry's office soon, and in a few moments they went there and Mr. Fry wrote the instruments in question and handed them to relator to read. After reading the papers relator objected to signing them. Stuart declared he would not pay relator anything unless they were signed, at the same time saying, in substance, that $750 was all there was of the estate of relator's mother and that he (Stuart) would so swear. Relator said he thought there was more money in the estate coming to him and at first refused to sign the papers, and would not sign them until he was assured $750 was the whole of the estate.

The substantial portion of Stuart's testimony regarding his transactions with Cardwell, which resulted in the execution of the settlement papers, is as follows:

"I married Rachel Cardwell in 1890, She was the mother of Charlie Cardwell, the plaintiff. My wife lived about three years after our marriage. We lived on Monroe street at my home. I had built a new house which was finished just before I married Mrs. Cardwell. I have known Charlie Cardwell since he was a boy. After I married his mother he made his home with us as one of the family up to her death. We charged him no board and gave him his board and washing. He stayed at my house a few days after his mother died.

"Q. State what you said to him about his mother's estate and matters of that kind. A. Well, it was a few days after she died he was at my house and I told him I had agreed to pay him or let him have $750 of that money. I says: 'Charlie, not a dollar of this belongs

to you, but from your mother's request I have granted it and will pay it to you.'

"Q.   What did you say to him about the payment of $750 to him?   A.   I told him that under certain conditions I had agreed to pay him or let him have $750 and that was if he would sober up, keep sober, quit his dissipation and become a steady man he should have the money.

"Q.   What, if anything, did you say about any estate that his mother left or what you owed her or she owed you; state fully what you said to him?   A.   I told him the condition of it.

"Q.   What did you tell him?   A.   I told him his mother had sold her place at $1,500 and that she was owing me then something near one hundred dollars over that amount.   She was indebted to me.

"Q.   About $1,600?   A.   Yes, nearly $1,600.   I don't recollect the exact amount, but pretty close to that. And says I:  'If you do what you promised, sober up, I will give you that $750, but if you don't do it, Charlie, you won't get it.'

"Q.   You told him if he would not do it he would not get it?   A.   No, and he promised me he would do it and he said he had promised his mother the same thing.   Well, it went on for three or four months; he right off went and united with the church and went to church regular day and night and to all appearances was perfectly sober and steady.   He come to me some three or four months after that first conversation and said he had filled his promise, he had sobered down, had not drank a drop for I don't know how long; had united with the church and was a sober, steady man and he would like to have that money, $750.   He said he wanted to build him a house.   He was going to marry right soon and wanted to build him a house and would like to have the money. I told him that was all-right. Says I: 'Charlie, from all I have seen and heard, I believe you have sobered up and become a steady man and if you will

come and go down with me here we will write the receipt and I wil pay you the money.

· "Q. Where did you go? A. That was not far from Mr. Fry's. We walked right into Mr. Fry's office, went in and I told Mr Fry what we came for right in the presence of Charlie. He and I came to get a receipt and told him what the receipt was for and all, and to write us a receipt.

"A. What did Charlie say about that? He sanctioned it, but said but little. He sanctioned it and very readily signed it without the slightest objection.

"Q. You may state to the jury whether Charlie read the receipts over. A. I think he read them over twice; I know he read them over once, and am rather inclined to think he read them over twice and handed them back and he signed the receipts.

"Q. Did he say anything there, Judge Stuart, about not wanting to sign those receipts? A. Not a word, sir, not a word.

"Q. Did you insist on his signing them? A. Not a particle. There was none. No sir, he signed them willingly and cheerfully.

"Q. Did Charlie claim any thing about there ought to be more money due him or anything of that kind? A. Not a word of that kind.

"Q, After he signed the receipts what did you do in the way of paying him any money? A. I gave him a check for $750 *and it was paid out of my own money.*

"Q. Did you know whether Charlie had an attorney at that time, whether he had anyone consulting him, or do you know? I don't know anything about that."

There was testimony going to show that the relator is very hard of hearing and almost incapacitated by the infirmity to transact business.

It was shown by A. S. Houston, that some time in 1891, after Rachel Cardwell had married the defendant Stuart, he (Houston) purchased from her a residence in the city of Mexico, Missouri, for $1500, giving his note

for the amount secured by a deed of trust on the property. The note bore interest at the rate of seven per cent. Subsequently Houston borrowed $700 more from Stuart, the old note was surrendered, the deed of trust securing it satisfied by Mr. and Mrs. Stuart and a new note for $2200 executed to Stuart only, and secured by deed of trust on the property. This note for $2200 represented, therefore, the original purchase-price of the property ($1500) which belonged to Mrs. Stuart and the $700 lent by Stuart. In June or July, 1893, and a few months after the death of Mrs. Stuart, Houston paid to Stuart the note for $2200. From the date of that payment, therefore, Stuart had in his hands $1500 and some interest, belonging to the estate of his deceased wife. The releases were procured from the relator July 26, 1893, when this cash was in the administrator's hands.

The verdict was for the plaintiff in the sum of $1568.75.

GOODE, J. (after stating the facts).—There have been three verdicts in this case in favor of the plaintiff and, on examination of the evidence, we are unable to see how a different result could have been reached. The judgment conclusively appears to be for the right party unless relator's cause of action is barred by the Statute of Limitations; which proposition we will investigate after considering the facts in regard to the relator's release of his interest in his mother's estate. He swore that he made the settlement and executed the two instruments of acquittance, on the representation of the administrator that the sum of $750 was all there was of the estate and that he (the administrator) would so swear. Stuart denied making any such statement and testified that what he said to the relator was that Mrs. Stuart had died owing him (Stuart) $1600, and, therefore, there was nothing going to the relator from the estate; but that in consideration of a promise made to Mrs. Stuart, he would pay relator $750 as he had ceased

dissipation and was leading a steady life. Though Mrs. Stuart when she died may have owed her husband a sum larger than the value of the estate she left, that fact was no excuse for his failure to inventory and account for all the money he collected as administrator. If she owed him and he wished to collect the debt, the right course to pursue was to present the demand to the probate court for allowance and have a special administrator appointed for the hearing. R. S. 1899, sec. 205. This proposition is conceded; but it is said that if Stuart thought he was entitled to retain the estate on account of what his wife owed him, he made no false representation to Cardwell. Several facts demonstrate that he had no such opinion; but was influenced by self interest in dealing with the relator. According to the theory of his rights represented to the relator and which he says he entertained, Stuart should have inventoried none of the money he received from Houston in payment of the debt the latter owned Mrs. Stuart. Houston paid Stuart $1500 after Mrs. Stuart's death as the price of a lot bought from her. It will be observed that Stuart inventoried half that sum as an asset of the estate. Now if he was entitled to retain any of the money to pay the $1600 he says his wife owed him, he was entitled to retain it all. Why should he inventory half and no more? No explanation consistent with his theory has been given for doing so, nor can we think of any. The inventory was filed July 8, 1893, and on July 26th Stuart procured from Cardwell a release of the latter's interest in the estate for $750 on the representation, Cardwell says, that said sum was the full value of the assets. It was just half what Cardwell's interest was worth if there were no debts, as Stuart then had $1500 in his hands as administrator. But Stuart swore he gave Cardwell $750, not because there was anything going to the latter, but because of a promise to Mrs. Stuart that Cardwell should have that much if his habits became good. This statement does not accord with the unmistakable facts of the transaction. Stuart

took from Cardwell no receipt for a gratuity, or sum given for the reason which he says induced him to give it, but two releases carefully prepared by his attorney, in one of which Cardwell was made to say that he received the $750 in full payment and satisfaction of his (Cardwell's) interest in the estate of Rachel Stuart, deceased, as her child and heir, and in the other and more elaborate instrument, that in consideration of William Stuart, as administrator of the estate of Rachel Stuart, advancing Cardwell the latter's interest in the estate, he (Cardwell) obligated himself not to request Stuart to pay said estate any money or claim that he (Cardwell) thought Stuart owed the estate. It further bound Cardwell against taking any proceeding in any court, or otherwise, in the way of claiming Stuart owed the estate anything. It is out of the question to reconcile such language as we find in the documents Cardwell was required to sign, and in the answer filed to plaintiff's petition, with Stuart's testimony that he was giving the $750 to his stepson in fulfilment of a promise, or as a reward for good conduct. The larger acquittance says, in substance, that Stuart, *not personally, but as administrator of his wife's estate, had advanced and paid Cardwell his (Cardwell's) interest in said estate.* According to Stuart's testimony Cardwell had no interest in the estate and he did not pay Cardwell as administrator of the estate, but gave him money. We think the evidence of bad faith in this controversy is conclusive. We will not, therefore, review the instructions or comment on them further than to say the case was instructed very fully and every phase of it well covered.

After relator's last replication was filed, in which the settlement between Cardwell and Stuart was assailed for fraud, the defendants filed an answer or rejoinder to the replication, interposing the Statute of Limitations. In the rejoinder it was alleged that the receipt and release were executed and delivered on the 26th day of July, 1893, more than five years after the execution and

delivery of said instruments, and more than five years before the filing of the relator's amended replication attacking the settlement for fraud. The defendants urge that the Statute of Limitations must protect the contract of settlement against that attack, because the instruments were not assailed for more than ten years after their execution. To render the point in hand intelligible, it is necessary to recount, to some extent, the course of the case. As appears from the petition and our statement, it is an action on an administrator's bond and the breach alleged is that the administrator, instead of inventorying and accounting for all the assets of the estate which had come into his hands, had converted part of the assets to his own use. The answer filed to the original petition pleaded that, as relator had transferred and assigned his interest in the estate to William Stuart in consideration of the payment of $750, he no longer had an interest therein. The only reply made to that part of the answer was a general denial, though the replication contained other averments relating to matters in the answer not connected with the acquittances. When the case was first in this court, the judgment for the relator was reversed and the cause remanded on the ground that the release contract had been impeached neither by allegations nor evidence and, therefore, stood as a bar to an action on the bond by the relator. After that decision an equity suit was instituted to vacate and set aside the settlement. The suit was prosecuted to a successful issue in the circuit court, but, on appeal, the judgment was reversed on the ground that the equitable relief ought not to have been sought in a separate suit, but in the present action, either by a separate count in the petition or by setting up in the replication to the answer, facts to show the releases were procured by fraud. (92 Mo. App. 586.) On October 4, 1902, a replication was filed in the case, from which we have quoted a portion relating to the releases. There was another trial and a judgment for the relator, which was reversed by this

court on the ground that neither the replication nor the evidence tended to impeach the releases by showing they were obtained by fraud. (102 Mo. App. 26.) After that decision the last replication was filed. A trial followed which resulted in the judgment from which this appeal was taken. The last replication was not filed until September 21, 1903, whereas the instruments attacked were executed July 26, 1893, more than ten years previously; therefore, it is contended by the defendants that relief against the releases or settlement because the relator was deceived and imposed on to induce him to settle, is barred by the Statute of Limitations. The particular section of the statute invoked provides that an action for relief on the ground of fraud must be commenced within five years after the cause of action shall have accrued, but that the cause of action shall be deemed not to have accrued until the discovery by the original party, at any time within ten years, of the facts constituting the fraud. R. S. 1899, sec. 4273. The solution of the problem of whether the Statute of Limitations is a bar to relator's recovery, depends on whether getting rid of the settlement on the ground that it was induced by fraud, is to be regarded as a cause of action in itself, which must be established by the relator. If it is an independent cause of action, as it was never brought forward nor asserted for more than ten years after the perpetration and more than five years after the discovery of the fraud, it is barred and the settlement remains intact and stands in the way of any relief to the relator. The Statute of Limitations runs against causes of action. Sebree v. Patterson, 92 Mo. 451, 458, 5 S. W. 31; Butler v. Carpenter, 163 Mo. 597, 63 S. W. 823. The fraudulent conduct of Stuart, relied on to annul the contract releasing relator's interest in the estate. was not fraud going to the contents of the instruments relator signed, but untrue representations of outside matters made to induce him to sign them. The relator knew the contents of the instruments and, according to his own statement, objected to

signing them, but was led to do so by a representation of
Stuart concerning the assets of the estate. A release or
acquittance can be disregarded when pleaded as a de-
fense to an action at law, if it appears that the party who
executed it was misled as to its meaning and effect, or
was incapacitated through mental infirmity, disease, or
otherwise to make a contract. See Koffman v. Railroad,
95 Mo. App. 459, 471, 68 S. W. 212, and cases cited there-
in. Prior to the enactment of the statute to be immedi-
ately noticed, if the signer of a contract releasing a de-
mand knew the contents of the paper and was induced
to sign it by fraudulent representations not relating to
its contents, but to outside matters adapted to influence
him, the acquittance had to be rescinded by a court of
equity before judgment could be given on the cause of
action released. The cases are not perfectly consistent
on this point, but the weight of authority and the later
decisions in this State declare the above rule. Homuth v.
Railroad, 129 Mo. 629, 31 S. W. 903; Och v. Railroad,
130 Mo. 27, 31 S. W. 962; Hancock v. Blackwell, 139 Mo.
440, 454, 41 S. W. 205; Vandervelden v. Railroad, 61
Fed. Rep. 54; George v. Tate, 102 U. S. 564. Until both
equitable and legal jurisdiction was conferred on the
same court, a separate suit to rescind the release had to
be carried to a successful issue in a court of equity before
an action on the released cause of action could be main-
tained in a law court. After the Code had blended the
two jurisdictions, the rule was established that a party
might state a case on the demand released in one para-
graph or count of his petition and state, in another para-
graph, the facts entitling him to cancellation of the re-
lease for fraud. With such a pleading before it, the
court, sitting as a chancellor, would try the proceeding
to set aside the acquittance, and if the finding was for
the plaintiff, the action at law on the original claim
would proceed to a verdict before a jury or the court sit-
ting as a jury. Cases cited, supra. Now, while the law
of procedure was in that condition, we think a proceed-

ing to get rid of a release or compromise of a legal demand, was a distinct cause of action, whether the settlement was assailed in a separate suit in equity, or a separate paragraph for equitable relief united in one petition with a paragraph on the released demand, or in the plaintiff's reply to an answer pleading the compromise in bar. In Courtney v. Blackwell, 150 Mo. 245, 278, the majority of our Supreme Court held that a party suing on a cause of action which he had been induced by fraud to compromise, instead of anticipating the defense on the settlement, might ignore it in his petition, and if the compromise was set up as a defense in the answer, attack it in a replication. It was stated that if the latter course was adopted, it would be the duty of the chancellor to try separately the equity proceeding and that plaintiff's legal action could not proceed until the release was annulled in equity. This was treating the rescission branch of the case as an independent proceeding, though brought forward in the replication instead of the petition. But for the express decisions of our Supreme Court on the point, there might be doubt if the rescission of a contract, or any other affirmative relief, could be obtained on a replication; for the statutes say the plaintiff, in reply to new matter pleaded in the answer, may deny it or may allege any new matter not inconsistent with the petition, constituting a *defense* to the new matter in the answer. R. S. 1899, sec. 2052. However, what is of immediate moment in this connection is that, whether pleaded in the petition or in a reply, a plaintiff's proceeding to annul a compromise agreement was regarded as a distinct and independent proceeding; not as part of the case on the original demand. The one proceeding was equitable, the other legal. The question of what constitutes a cause of action is elucidated in Pomeroy's work on Code Remedies (4 Ed.), sec. 346 et seq. We understand that the facts of a controversy may be such as to render it possible to ask legal relief in one paragraph of a petition and equitable relief in another,

without stating more than one cause of action; as, for instance, where a party brings as action of ejectment and asks in connection with it, the reformation of a deed in his chain of title. Various illustrations of single causes of action which require and authorize both equitable and legal relief, are given by Pomeroy. But when a legal right of one person is violated by another, the former has a cause of action on account of the violation; and if he is imposed on and induced to compromise that demand, this gives rise to another cause of action. If a man is injured by a locomotive negligently operated, his right to have care taken not to injure him is disregarded and this wrong gives the injured person, if himself in the exercise of care, a complete cause of action. It is then his further right that no fraudulent practices be used to induce him to release this cause of action; and if he is induced, by fraud, to release it, a second cause of action for that wrong accrues to him. It strikes us that, in the present case, under former procedure, Stuart's conversion of the assets to his own use, constituted one cause of action in favor of the relator and the subsequent fraudulent procurement of the releases a second and distinct cause of action. This is according to the test furnished by Mr. Pomeroy, and supported by many precedents cited in his notes. Pomeroy Code Procedure, sec. 349, 351, inclusive. We would be inclined to hold, therefore, but for the statute copied below, that the proceeding to set aside the settlement and acquittance was barred by the Statute of Limitations; that the instruments executed in consummation of that settlement could not be assailed for fraud more than ten years after their execution and, therefore, stood as an insuperable bar to a recovery on the original claim. We must hold these instruments were intended as a discharge of any cause of action that the relator had on account of the administrator's converson of the assets of the estate, because that was decided on a former appeal and is the law of the case. State ex

rel. v. Stuart, 74 Mo. App. 182. The statute in question
is as follows:

"Whenever a release, composition, settlement or
other discharge of the cause of action sued on, shall be
set up or pleaded in the answer in bar to plaintiff's cause
of action sued on, it shall be permissible in the reply to
allege any facts showing or tending to show that said re-
lease, composition, settlement or other discharge was
fraudulently or wrongfully procured from plaintiff, and
the issue or issues thus raised shall be submitted with all
the other issues in the case to the jury, and a general ver-
dict or finding upon all the issues, including the issue or
issues of fraud so raised, shall be sufficient." R. S. 1899,
sec. 654.

There might be a question as to whether that statute
was intended to embrace settlements like the one in proof
in this case. The contract of settlement between relator
and Stuart was not strictly a release or accord and sat-
isfaction of any cause of action Cardwell had for Stu-
art's tortious conversion of the assets of the estate. It
was, in effect at least, an assignment to Stuart of Card-
well's interest in the estate. The statute is directed
against fraudulent compositions by which an aggrieved
person settles his grievance and relinquishes the right to
sue on account of it. The language of the enactment in-
cludes a release of any cause of action and must, there-
fore, embrace the settlement in this case if it was taken
as a release of the cause of action sued on by the relator.
That it was taken for that purpose has been adjudicated
before.

The statute in question first appeared in the
revision of 1899 and as it dealt only with the remedy
and not with the right, affected the present cause,
though it was pending when the act was passed. The
statute worked a radical change in the procedure to be
adopted to rescind for fraud a settlement of a cause of
action. Now, no trial must be had on the issue of fraud
and a judgment obtained annulling the settlement, be-

fore the main cause of action can be tried, as was formerly the rule. Instead, the necessary procedure would be for the suing party to introduce evidence to establish the original cause of action; the defendant then offer evidence of a settlement, and the plaintiff next introduce evidence that the settlement was procured by fraud. Of course, this order would not have to be followed in introducing the evidence. A plaintiff may put in his evidence of fraud in connection with testimony to support the demand if he chooses. But the essential fact is that the statute converts the question of the validity of a compromise settlement into an issue in a case on the matter or cause of action compromised; whereas, formerly that question, when raised on the ground of fraud, was an independent cause of action in itself. As the law now allows a settling party to sue on the compromised demand as if there had been no settlement, and if the settlement is pleaded, attack it in a reply, it looks like there is no bar to a recovery until the Statute of Limitations has run against the original claim. It certainly was not necessary for this relator to charge in this petition that he was induced to enter into the release agreement by fraud, in order to state a cause of action. The petition stated a complete cause of action without referring to the settlement. State ex rel. Hospes v. Branch, 112 Mo. 667, 20 S. W. 693. It stated one, too, which the evidence made good unless the release was a defense, and it was incumbent on the defendants to show a prima facie defense by proving the settlement. When the defendants

(Page 497, line 29.)

allegation of the reply that the release was obtained by fraud. But as the reply was in the nature of a confession and avoidance of the defense pleaded in the answer, and was not plaintiff's cause of action, we do not see how the Statute of Limitations could run against it. A somewhat similar proposition was decided in Jackson v. Plyler, 38 S. C. 496, 37 Am. St. Rep. 782. That was a suit to foreclose a mortgage on real estate. The mortgagor

had died, and his widow having subsequently remarried, the action was against her and her child as heirs of the mortgagor. Her first husband had executed a deed to her for the land in controversy, prior to the execution of the mortgage to be foreclosed. She interposed that deed as a defense to the suit and the plaintiff (mortgagee) by replication, averred that the deed was fraudulent and void. A rejoinder was filed to this replication, averring that the deed could not be assailed for fraud because the Statute of Limitations barred any relief on that ground. It was said the Statute of Limitations had nothing to do with anything but the cause of action stated in the petition, which was the foreclosure of the mortgage; that the plaintiff having established the cause of action set forth in his complaint, was entitled to judgment of foreclosure, unless paramount title was shown in the defendant, the widow of the mortgagor; to show this she relied on the deed, and the plaintiff was at liberty to prove any defect in the deed which would render it insufficient to vest title in the defendant. We think our present statute in question renders this case analogous to the one under consideration as to the bar of the Statute of Limitations.

In Amaker v. New, 33 S. C. 28, the same proposition was ruled on somewhat similar facts. That was an action for the possession of certain lands, both parties claiming from a common source of title, Absalom Inabnet. Said Inabnet while indebted had conveyed the land to Wm. H. Bennett in trust for the sole and separate use of the grantor's wife for her life, and, at her death, to be equally divided among his children. After the execution of that deed judgments were obtained against the grantor Inabnet, and the land levied on and sold by the sheriff. The plaintiff had acquired the title passed by the sheriff's sale. The dowress having died while in possession of the land, Frances New, the defendant in the case and daughter of the dowress and the original grantor, Absalom Inabnet, took possession; Amaker, claiming title from the sheriff's sale, brought his action to re-

cover the land. The defense was the deed executed by Inabnet declaring a trust in favor of defendant, prior to the judgments against him and the sale thereunder. It was contended that as that deed had not been attacked or set aside within the statutory period (6 years) it gave the defendant a perfect title and could not be attacked thereafter. The lower court gave this instruction to the jury:

"I instruct you that after six years after Sistrunk got title, he was barred and deprived of assailing the deed on the ground of fraud, and that Amaker, with constructive notice of this deed, is affected by the neglect of Sistrunk, under whom he claims; and that if more than six years have elapsed from the time this deed was put on record to the time that he instituted his suit he is debarred from assailing the deed on the ground of fraud against existing creditors, and this deed being assailed in this way, the defendant has a superior title and the defendant must prevail."

In discussing the limitation defense, the court said that a creditor who wished to subject to payment of his debt property of debtor which had been conveyed by the debtor to another person before the creditor obtained judgment on his demand, had two remedies: he might disregard the conveyance as fraudulent and void and proceed to sell the property under execution, leaving the validity of the deed to be proved by the holder; or might by a suit on the equity side of court, have the deed set aside for fraud and the land subjected to the debt; that if he resorted to the latter mode of relief, he must commence his action within four years after the discovery of the fraud or such action would be void; and that the equity rule was now made statutory by section 112 of the South Carolina Code, of 1902, and the time enlarged from four to six years. The court then said:

"This being an action to recover possession of real estate, and not an action to set aside a deed for fraud, I am unable to see how the plea of the Statute of Limi-

tations can be applied; for certainly the right of action did not arise until the estate of dower fell in by the death of the widow, and the action was commenced within a year after that event occurred. The plea of the statute, as it is called (improperly, as I think, for such a plea must be directed to the cause of action set forth in the complaint), is not directed to the plaintiff's cause of action, but is interposed as a protection against an attack made by the plaintiff upon the defense set up by the defendants. The plaintiff having made out a prima facie title, as shown by the refusal of the motion for nonsuit, to which no exception was taken, the defendants undertook to show a superior title in themselves under the deed in question, and surely the plaintiff was entitled to show any defect in that deed which would render it insufficient to vest title in the defendants, either by showing that it was not under seal or not executed in the presence of two subscribing witnesses, or that the grantor was *non compos,* or that it was not recorded. If so, why may it not also be shown that it was void for fraud?

"I do not understand that it ever was the rule that a deed or other instrument could not be attacked for fraud after the lapse of the prescribed time in any way, but only that it could not be attacked by an action instituted for that purpose. I can very well understand how the law, from considerations of public policy, may forbid one from invoking its aid by bringing an action to set aside a deed for fraud after the time limted for the purpose; but I am unable to understand upon what principle, either of law, equity, or good morals, one who has made out a prima facie case for the relief he demands, can be forbidden from showing that the defense set up against his claim is founded in fraud, simply because such fraud had been committed so long ago as to bar an action brought to obtain relief from such fraud; and I do not think any case can be found which would sanction such a doctrine.

"It seems to me that any other view would render

the conceded right of the creditor to discharge the fraudulent deed and sell the land under his execution absolutely nugatory. For, in such a case, all that the grantee under the fraudulent deed would have to do, would be to wait until the expiration of six years, and then assert his claim under such deed, when, under the view contended for, it would be shielded from attack on the ground of fraud by the Statute of Limitations. If it should be said that the creditor after purchasing his land under his execution, could protect himself by bringing an action to remove a cloud from his title, by having the deed declared void for fraud, this is only saying that one of the conceded modes of relief which a creditor has, cannot be made effectual without resorting also to the aid of the other mode of relief; which practically amounts to saying that the *only* effectual mode of relief is by an action to set aside the deed for fraud, and that the other mode is but a delusion."

While there was a dissenting opinion, the majority opinion was approved in the subsequent case of Jackson v. Plyler, supra. If those decisions are sound law, it seems that in an action at law a party may annul for fraud an instrument which stands in the way of his recovery and is pleaded in bar, even when a direct suit in equity to annul it cannot be maintained on account of the limitation statutes. We are not driven to so extreme a position. If setting aside the compromise settlement was a necessary preliminary step for the relator to take before he could maintain an action on the demand released, we would incline to hold that the proceeding to get rid of the release was a separate and distinct cause of action against which the Statute of Limitations would run. But as by our own statute, the attack of the release can no longer be regarded as a distinct cause of action when made in an action at law, but as matter of reply to the answer in the nature of a confession and avoidance, we hold the relator's cause was not barred and affirm the judgment. All concur.